STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. KEITH
W. MATULEWICZ, DEFENDANT-APPELLANT.

Argued January 17, 1989—Decided May 11, 1989.

*Lewis Stein* argued the cause for appellant (*Nusbaum,
Stein, Goldstein, Bronstein & Compeau,* attorneys).

*Robert C. Lang, Jr.,* First Assistant Prosecutor, argued the
cause for respondent (*Nicholas L. Bissell, Jr.,* Somerset County
Prosecutor, attorney).

The opinion of the Court was delivered by

O'HERN, J.

Child abuse is not just a sociological phenomenon; it can be murder, and it can be capital murder. The question here is whether this is a capital murder case. In *State v. McCrary*, 97 *N.J.* 132 (1984), we approved, in limited circumstances, pretrial review of the factual basis for the statutory aggravating factors that the prosecutor seeks to use to establish death eligibility under New Jersey's capital punishment act, *N.J.S.A.* 2C:11–3. This interlocutory appeal requires us to review an application of the *McCrary* procedures in light of our subsequent decisions in *State v. Biegenwald*, 106 *N.J.* 13 (1987), and *State v. Ramseur*, 106 *N.J.* 123 (1987), in which we determined the constitutionality of the capital punishment act and established standards for its application. Specifically, we must determine whether a factual basis was presented to charge the defendant with murder that involved "aggravated assault" or "torture" of the infant child in his custody.

First, we review the Court's definition of the "aggravated assault/torture" element of *N.J.S.A.* 2C:11–3c(4)(c). Then we consider the threshold measure of proof required under the principles of *State v. McCrary* to determine whether a case may be prosecuted as a capital case. Finally, we determine whether the proofs meet the *McCrary* threshold.

I

In *Gregg v. Georgia*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), the Supreme Court upheld the Georgia capital sentencing statute, concluding that the statute contained safeguards that promised to eliminate the constitutional defects that previously had resulted in death sentences that were "wantonly and * * * freakishly imposed," and "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman v. Georgia*, 408 *U.S.* 238, 309–10, 92 *S.Ct.* 2726, 2762–63, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). In *Zant v. Stephens*, 462 *U.S.* 862, 879, 103 *S.Ct.*

2733, 2744, 77 *L.Ed.*2d 235, 251 (1983), the Court explained that although no specific set of procedures had been set down to satisfy the concerns of *Furman,* it found that "[t]he Georgia scheme provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage."

In New Jersey, the categorical narrowing is established by limiting capital punishment to murders specified in *N.J.S.A.* 2C:11–3c and by requiring at least one of the aggravating factors set forth in 2C:11–3c(4). This categorical narrowing must be based on standards that will withstand a claim of vagueness.

Section c(4)(c) lists as one of the aggravating factors that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim." [1] Recognizing that we must provide each sentencing jury with specific guidance concerning the nature of the crimes that will satisfy the statute, in *State v. Ramseur, supra,* 106 *N.J.* at 197–211, Chief Justice Wilentz set forth the Court's understanding of the legislative meaning of this aggravating factor. In that case and in *State v. Biegenwald, supra,* 106 *N.J.* at 48–52, we confined the meaning of the statutory phrase "murder [that] was outrageously or wantonly vile, horrible or inhuman" to the second portion of the statutory provision, i.e., murders that "involve[ ] torture, depravity of mind, or an aggravated battery to the victim." *N.J.S.A.* 2C:11–3c(4)(c). In *Ramseur* and *Biegenwald* this Court elaborated on the meaning of each of these subsidiary considerations.

Reasoning that the Legislature had intended that the most accurate measure of criminal culpability was the state of the

---

[1] As originally enacted, the c(4)(c) factor used "aggravated battery" to describe this element. The act was amended in 1985 to substitute "aggravated assault" for "aggravated battery." We found that it conveys the same meaning for the c(4)(c) factor. For a discussion of the significance of the change, *see Ramseur, supra,* 106 *N.J.* at 206 n. 33.

actor's mind, we interpreted factor c(4)(c) in that light. Hence, the c(4)(c) elements of aggravated assault and torture are limited to "the class of murders in which defendant intended to, and did in fact, cause extreme physical or mental suffering—in addition to death. * * * Thus, the extreme physical or mental suffering must be precisely what defendant *wanted* to occur in addition to death." *Ramseur, supra,* 106 *N.J.* at 208–09 (footnote omitted). Thus viewed, we reasoned that the requirement that the defendant intentionally inflict extreme physical or emotional pain in addition to death eliminates the need for a distinction between the statutory terms "aggravated assault" and "torture." "We are convinced that the essence of the legislative concern is the defendant's state of mind." *Id.* at 207. We concluded that the Legislature's concern, as evident in the aggravated assault/torture element of c(4)(c) was "to punish most harshly those who *intend* to inflict pain, harm, and suffering—in addition to intending death." *Id.* at 208.

The depravity-of-mind element of c(4)(c) is established by the senselessness of the killing, *i.e.,* "the complete absence—from society's point of view—of any of the recognizable motivations or emotions that ordinarily explain murder. The definition of this kind of murder is *not* vague." *Id.* at 210. Such a killer is one "who does it because he likes it, perhaps even because it makes him feel better, who kills bystanders without reason, who kills children and others whose helplessness would indicate that there was no reason to murder * * *." *Id.* at 209 (footnote omitted). It included as well one who intentionally mutilates a corpse. *Id.* at n. 37.

Concededly, there is hardly ever direct evidence of an actor's state of mind, but the intent to torture or inflict gratuitous pain may be inferred from the circumstances of the crime. For example, in *State v. Ramseur,* the defendant's vengeful act in coming back to inflict additional stab wounds on the dying victim, combined with his own statements, well demonstrated his intent to inflict needless suffering on the already dying victim. 106 *N.J.* at 288. In *State v. Zola,* 112 *N.J.* 384, 434

(1988), we observed that the scalding or stabbing of the body of the strangled victim could establish either an intent to inflict nonlethal, purposeful torment or a senseless desecration of the victim's body. In sum it is the evidence of intent to inflict extreme pain, harm, and suffering, in addition to causing death, that establishes the c(4)(c) element of aggravated assault/torture and the constitutional narrowing of intentional murders that are death-eligible.

## II

Under the New Jersey Code of Criminal Justice, a defendant convicted of purposeful or knowing murder can be sentenced to death only if one or more statutorily-specified aggravating factors exist and outweigh, beyond a reasonable doubt, any mitigating factors. *N.J.S.A.* 2C:11–3c(3). The Code requires that the prosecuting attorney give the defendant notice of any aggravating factor that he intends to prove either "[p]rior to the commencement of the sentencing proceeding, or at such time as he has knowledge of the existence of an aggravating factor." *N.J.S.A.* 2C:11–3c(2)(e). In adopting our Rules to implement the capital-sentencing act, we required the prosecutor to give the notice of aggravating factors and supporting discovery to the defendant at the time of arraignment. *R.* 3:13–4(a). In *State v. McCrary, supra,* 97 *N.J.* at 141, we noted the extraordinary difference between a capital case and a noncapital case: the death qualification of the jurors, the requirement of an entirely distinct sentencing phase, the gathering of proof and extensive investigation into the defendant's background for presentation of mitigating factors are unique to the capital trial. Most importantly, we concluded that "the specter of death should not hang over the head of an accused without some basis in fact." *Ibid.*

Hence we approved, in limited circumstances, pretrial review of the validity of the aggravating factors asserted. Recognizing the broad charging discretion of prosecutors, we sought to

fetter it only to the extent necessary to protect a defendant's rights. We have since recommended that the Attorney General and the various County Prosecutors, in consultation with the Public Defender, adopt guidelines for use throughout the State by prosecutors in determining the selection of capital cases. *State v. Koedatich,* 112 *N.J.* 225, 258 (1988), *cert. denied,* —— *U.S.* ——, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). This case follows too closely upon that decision to reflect the results of such a process. In the absence of further guidance, we will apply the standard of review adopted in *McCrary.* The standard was similar to that applied in striking an indictment, a discretion not to be exercised except on "the clearest and plainest ground." *Id.* 97 *N.J.* at 144 (quoting *State v. Davidson,* 116 *N.J.L.* 325, 328 (Sup.Ct.1936), *quoted in State v. Weleck,* 10 *N.J.* 355, 364 (1952)). The defendant must "demonstrate that evidence is clearly lacking to support the charge." *McCrary, supra,* 97 *N.J.* at 142. The procedure that we envisioned does not require the prosecutor to prove his case before trial: "[i]t does no more than serve to assure that there is some evidence that justifies the submission of the specified aggravating factors to the trier of fact * * *." *Id.* at 143. We emphasized that there was not to be a trial within a trial and an order for the production of testimony would be the exception to the rule. *Id.* at 144. While there has been some question of the fairness of requiring the defendant to prove the absence of evidence to support the factors, the present case rather clearly demonstrates the ease with which the basic question is resolved. The State furnished defendant with its pathological reports, grand jury minutes, and the defendant's own confession. It is the measure of this evidence that we address.

## III

Is there, then, "some evidence that justified the submission" of the aggravated assault/torture element of c(4)(c) to the trier of fact? This case evokes the same horrors that society has witnessed all too frequently in recent years. In New Jersey

alone, twenty-four children died of abuse last year. Patterson, "Deaths from child abuse, neglect increase to record levels in state," *Star–Ledger*, Feb. 1, 1989, at 1. Regrettably, it is also true that many fatal child-abuse cases involve the kind of torture of the victim that characterizes capital murder. *See State v. Bass*, 221 *N.J.Super.* 466 (App.Div.1987) (multiple lacerations, burn marks, and recent fractures). The question in this case is whether there is evidence, circumstantial or direct, that would establish the defendant's intent to inflict on his child extreme pain and torment in addition to the fatal blows that caused her death.

The evidence presented is that on October 7, 1987, the defendant called the police to summon the rescue squad for his four-month-old daughter, Heather Matulewicz. Defendant told the responding officer that Heather had vomited on herself and while he was attempting to bathe and change the baby, she had slipped from his arms, fallen to the floor and struck the back of her head. When defendant's attempts at CPR failed, he summoned the police. Heather was taken to the pediatric intensive care unit at the Robert Wood Johnson Hospital.

The responding officer became suspicious when he noticed an unexplained bruise on the baby's forehead. A detective from the Major Crimes Unit of the prosecutor's office went to the hospital, where he observed a bruise on Heather's right hip-buttock area. Discussion with a social worker revealed that Heather had previously been hospitalized for head injuries in June 1987. He obtained a search warrant for defendant's apartment, but he found no evidence that the child had been sick or bathed to corroborate defendant's story.

The defendant was advised of his *Miranda* rights, waived them, and agreed to respond to questioning by a member of the prosecutor's office. Defendant admitted lying to the responding officer, and confessed to striking blows to the baby's head, forcefully throwing her into her crib, and then vigorously shaking her until she stopped breathing. He claimed that on

previous occasions when he had hit Heather she had stopped crying. He maintained that he "just went a little bit overboard * * * [but] never meant to hurt her."

Heather died on October 13, 1987. The autopsy report listed the cause of death as "[e]xtensive brain edema, retinal hemorrhages due to shaking and blunt force trauma. Survival for six days with anoxic cerebral necrosis and pneumonia." There was evidence of blows to the head that bruised the brain. Such a bruise causes swelling of the brain tissue and cuts off the blood flow to the brain, resulting in death. Although there was evidence of physical blows to Heather's body, no scars, burns, or mutilation were present. As senseless as this homicide was, the State did not assert before us on appeal that it was in any sense a thrill killing or one that was bereft of anger or frustration or a recognizable human emotion. Hence, there is no claim that the "depravity of mind" element of c(4)(c) has been satisfied, the State focusing solely on the aggravated-assault/torture element.

The argument at the *McCrary* hearing primarily addressed the proofs of the injury. The State emphasized the following:

There's a statement by the defendant saying this child had been battered on June 29th, 1987, and October 7th, 1987, both times to the extent that the child stopped breathing and had to be hospitalized. Medical evidence will show the injuries suffered by this four-month-old child, including bruises, brain hemorrhage, were to the point where the child was unable to survive.

Your Honor, with regard to the Ramseur decision, torture is defined as either physical torture or mental torture, and I submit to the Court that it doesn't take much imagination to infer physical torture from being shaken to death as well as suffering forced trauma, which Dr. Badgen acknowledges in his report as a possible cause of death.

So, I submit, your Honor, that there's clearly sufficient evidence to sustain the itemization of the aggravating factor in this case.

The trial court agreed that the State had met its burden under *McCrary*, noting that

while it may well be that to shake a 10–year–old or a 15–year–old child may not amount to conduct which is, as stated in this factor, outrageously or wantonly vile or horrible or inhuman, perhaps it doesn't involve torture or an aggravated assault to the victim, but I think that bearing in mind that we are dealing with a totally defenseless human being, a four-month-old child, that that question is

one that should not be resolved by the Court, but is a determination which should be made by the jury.

Accordingly, the defendant's motion to strike *N.J.S.A.* 2C:11–3c(4)(c) as an aggravating factor was denied. The Appellate Division denied leave to appeal that ruling. We granted defendant's motion for leave to appeal. 114 *N.J.* 301 (1988).

The question that we must resolve is whether, in the words of *Ramseur,* there is some evidence that Heather endured "extreme physical or mental suffering" that was "precisely what defendant *wanted* to occur in addition to death." 106 *N.J.* at 208–09. As noted, there will be some cases in which needless torture will be apparent, such as from the presence of burns on a child's body or from chaining. The State points to the defendant's previous beating of the child as evidence of an intent to inflict this type of needless pain.

Evidence of arguments or violence relating to a defendant and a homicide victim is admissible in the State's case to prove intent or state of mind, usually the intent to kill or to do grievous bodily harm. *See State v. Ramseur, supra,* 106 *N.J.* at 264–67 (evidence of defendant's prior violence toward decedent admissible to counter argument that his action was unknowing result of epilepsy). In this case, the prior incident may therefore establish an intent to do more than quiet the baby. To the extent that the prior incident is offered to prove that on this occasion the defendant intended only to inflict serious bodily injury on the child, it may be insufficient to support a capital sentence because of the constitutionally-required culpability standards regarding a capital defendant's intent to kill. *See State v. Gerald,* 113 *N.J.* 40 (1988). However, even if it establishes an intent to kill, without more the prior incident does not establish an intent to "cause extreme physical or mental suffering—in addition to death." *Ramseur, supra,* 106 *N.J.* at 208. As *Ramseur* and *Zola* explain, that intent may be inferred from supporting circumstances, e.g., returning to a dying victim, inflicting wounds and suffering different in nature from the lethal injuries, or from expressions of intent to

make the victim suffer mentally or physically. In some cases, the method of killing may demonstrate that intent to torture the victim. The pathological evidence presented thus far is insufficient to establish that point.

While the abject helplessness of the child-victim evokes extraordinary concern, we have established the categorical narrowing of capital murders by reference to the criminal's mind. We may wish to compare the facts of this case with those present in *State v. Ramseur*. As the *Ramseur* trial court summarized the State's evidence,

> there was plainly a disfigurement, there was a brutal attack upon the victim consisting of many stab wounds. The defendant then left the scene and walked across the street. The victim was still alive. Defendant according to the witnesses calmly returned. The victim knew she was dying and so stated at the time. She was plainly conscious. The fact that the defendant while the victim was alive threatened to kill her grandchildren if he could find them, the fact that the killing occurred in the presence of the grandchildren and the fact that after making this threat, probably the worst threat that could possibly be made to a dying person, the victim was executed. [*Ramseur, supra,* 106 *N.J.* at 288.]

Without in any sense mitigating the horror of the present crime, it draws too fine a line to ask a jury to resolve on the evidence so far disclosed that any extreme physical or mental suffering that Heather experienced was precisely what the defendant wanted to occur in addition to death. *See id.* at 206 ("[D]eath should not be imposed as a result of what may be an extremely close determination of how much pain is 'necessary' [to kill].") (commenting on *State v. Sonnier,* 402 *So.*2d 650, 658–60 (La.1981), *cert. denied,* 463 *U.S.* 1229, 103 *S.Ct.* 3571, 77 *L.Ed.*2d 1412 (1983).

Application of *McCrary* principles to the c(4)(c) factors in such cases requires an especially sensitive exercise of judicial supervision. After all, a capital murder case presupposes an intent to kill and not just injure. Hence, the natural question is—"Why do it this way? Why shake the body of a helpless infant to death?". If death is all the actor intends, there is no need to inflict such pain on the infant. Yet, as Justice Handler points out in his concurring opinion, *post* at 209 n. 2, the State

does not invariably prosecute such cases as capital-murder cases. It is not baby-death that makes the case capital, but the presence of some other distinguishing intent to inflict torture or pain.

This is not to say that this case cannot or will not be a capital case. The striking of an aggravating factor is without prejudice to a later application for its introduction should additional supporting evidence come to light. We outlined in *McCrary* the procedures to be followed in that circumstance. 97 *N.J.* at 144–45. On this record, applying the standards of *McCrary*, we are unable to find evidence that justifies the submission of the specified aggravating factor to the jury.

The order denying defendant's motion to strike the aggravating factor c(4)(c) is reversed. On this record, the factor should be stricken. The case is remanded to the Law Division for further proceedings consistent with this opinion.

HANDLER, J., concurring.

This is an interlocutory appeal in a capital-murder case. The defendant, Keith Matulewicz, contests the prosecutor's decision to try him for capital murder. The prosecutor relies solely on aggravating factor *N.J.S.A.* 2C:11–3c(4)(c) ("c(4)(c)") as the basis for treating the case as a capital murder. In accordance with the pretrial procedure authorized by this Court in *State v. McCrary*, 97 *N.J.* 132 (1984), the defendant challenges the sufficiency of the State's evidence to support this aggravating factor.

I concur in the judgment of the Court that the evidence proffered by the State is altogether insufficient to prosecute this homicide as capital murder under aggravating factor c(4)(c). I once again write separately to express reservation over the lenient standard employed by the Court to test, in the pretrial stages of a capital case, the sufficiency and competency of the State's evidence supporting an alleged aggravating

factor that serves as the basis for prosecuting a homicide as capital murder.

## I.

A capital-murder prosecution in New Jersey proceeds in distinct stages. In order for a defendant to be charged with capital murder and for the case to proceed as a capital-murder prosecution under the capital murder-death penalty act, three elements of death-eligibility must be satisfied: (1) the defendant must have purposely or knowingly caused the death of another, *State v. Gerald,* 113 *N.J.* 40 (1988); (2) he or she must have committed the murder by his or her own hand or paid someone else to do so, *N.J.S.A.* 2C:11–3(c)(1); and (3) at least one of the aggravating factors enumerated in *N.J.S.A.* 2C:11–3, subd. c(4)(a) to (h) must be present. These elements, while all critical in establishing that a defendant has committed capital-murder and is death-eligible, are established at different times and in different ways. The first two elements, involving culpability and causal responsibility, must be determined by a grand jury and charged in the indictment. They must also be determined beyond a reasonable doubt by a petit jury in the actual trial of the guilt issue, before the defendant is exposed to the death penalty. In contrast, the third element, the presence of an aggravating factor, is determined initially and given legal effect by the prosecutor alone; this is accomplished not by any adjudicative process or hearing but simply by the prosecutor serving a notice of aggravating factors. Moreover, this aggravating factor is actually determined by a jury after the defendant has been found guilty and as part of the jury's death determination in the trial at the sentencing phase.[1] In sum,

---

[1]The statutory scheme that allows death-eligibility to be determined and a jury to consider the imposition of the death penalty without each necessary element of death-eligibility first being proved beyond a reasonable doubt is, in my view, constitutionally deficient. *See State v. Ramseur,* 106 *N.J.* 123, 402–04 (1987) (Handler, J., dissenting).

under the prosecutorial scheme of the capital murder-death penalty act, *all* of the elements that render the defendant eligible to be prosecuted as a capital offender must be charged, but only two must be supported by a grand jury's determination of probable cause. With respect to the aggravating-factor element, only the prosecutor's decision is needed; "[b]y such notice alone a homicide case is transformed into a capital proceeding . . . triggering both the death qualification of a jury and a separate sentencing proceeding." *McCrary*, 97 *N.J.* at 140.

In *McCrary*, this Court concluded that the prosecutor's decision to serve a notice of aggravating factors could not be entirely insulated from judicial oversight because of the momentous consequences resulting from such a determination. *Id.* at 140. The Court recognized that since the notice of aggravating factors is the turn-key to a capital prosecution, such allegations must be founded on an evidential base. "The need to ensure that such a source exists compels some preliminary review to satisfy the interest of the public and the defendant that such charges not proceed to trial without a factual mooring." *Id.* at 143.

The Court in *McCrary* thus authorized a pretrial proceeding to test the evidentiary sufficiency of aggravating factors alleged in a capital case. However, in determining the scope of such a proceeding, the Court's avowed goal was to effect only a minimal intrusion into the area of prosecutorial discretion. *Id.* at 142. Sensitive to the prosecutor's charging discretion, the Court sought to constrain it only to the extent necessary to protect a defendant's rights. *Ibid.* Therefore, in fashioning the standard of review, the Court analogized the situation in which a defendant moves to strike an aggravating factor to one in which he or she moves to dismiss an indictment in an ordinary criminal case. Pursuant to this standard, the defendant must demonstrate that evidence is clearly lacking to support the submission of the factor to the jury—that is, a reasonable fact finder could not conclude the factor exists. *Id.*

at 142–44. In addition, the Court held that hearsay evidence may be admitted at such a pretrial proceeding to support the existence of alleged aggravating factors. *Id.* at 145–46.

A defendant must be assured that there is a reasonable, well-founded basis to prosecute him or her for capital murder. The slight evidentiary burden imposed on the prosecutor, in terms of both the quantity and competency of evidence is, in my view, insufficient to generate this assurance. This is particularly true when the aggravating factor alleged is, as in this case, the hopelessly overbroad and vague c(4)(c) factor, which fails adequately to guide jury discretion and prosecutorial discretion alike. *Ramseur, supra,* 106 *N.J.* at 405 (Handler, J., dissenting). Because a prosecutor's decision to transform a murder case into a capital proceeding is almost limitless —uninformed by any uniform guidelines and unchecked by any guarantee of proportionality review—the standards that govern this critical, initial stage of a capital prosecution must be more exacting. It is essential that meaningful standards provide an effective check on this pivotal determination in order to guard against the arbitrary imposition of the death penalty. The *McCrary* standard of review, which accords wide deference to the prosecutorial decision by requiring but a slight evidentiary showing in order to activate the capital-murder machinery, does not accomplish this crucial goal.

## II.

The standard governing the dismissal of an indictment, which the Court adopts in capital cases to test the evidential sufficiency of aggravating factors, is a relatively easy one for the prosecution to satisfy. The charges set forth in the indictment enjoy a presumption of validity, requiring a defendant who challenges their sufficiency to demonstrate that evidence is clearly lacking to support the charges. *McCrary,* 97 *N.J.* at 142. In the ordinary criminal case, this is an entirely appropriate standard by which to determine whether a particular charge

is grounded in a sound evidential basis. It enables the accused to rid himself or herself of meritless, unwarranted allegations while neither abrogating a prosecutor's charging discretion nor requiring the presentation of proof of the entire case in advance of trial.

But a capital case is not an ordinary criminal case. The prosecutor's decision to serve a notice of aggravating factors activates the heavy machinery of a capital trial. The process, once started, engenders tremendous costs in terms of time, expense, energy, and emotion. The increase in pretrial preparations, the proliferation of pretrial motions, applications, and hearings, the added complications attendant on jury selection and the death qualification of jurors, the heightened concerns surrounding the trial itself, the need for more extensive pre-sentencing investigation and preparation, the separate sentencing procedure, and the mandatory appeal all command an enormous commitment and investment of judicial and executive resources. Moreover, there is an extraordinary and painful emotional toll that is exacted at a personal level, affecting not only the participants in the trial but also their families, particularly the family of the victim. Such effects may linger long after a defendant has been convicted of capital murder. *See* 123 *N.J.L.J.* 577, 580 (March 9, 1989) (father of murder victim claims the appeals process in a capital case is cruel and unusual punishment for the survivors). These considerations counsel that before the financial, temporal, and emotional commitments are made to the prosecution of a homicide as a capital cause, we must be convinced that such a prosecution is fully warranted and that the basis for such a determination is well-founded. Placing a more exacting evidentiary burden on the State and engaging in more stringent pretrial review of the sufficiency of the evidence supporting the prosecutor's alleged aggravating factors will go far toward reducing the personal and public costs and sacrifices of unwarranted capital prosecutions, and will help to ensure the ultimate reliability and appropriateness

of capital convictions. The *McCrary* standard falls far short of generating these assurances.

In addition, another vice of the *McCrary* standard is its failure adequately to check the virtually unlimited discretion afforded prosecutors in choosing to charge a defendant with capital murder; consequently, this standard is unable to reduce the threat of arbitrariness and disproportionality in the imposition of the death penalty. In *State v. Ramseur*, I expressed the view that under constitutional and fundamental-fairness doctrines, our capital murder-death penalty statute did not provide sufficient guidance to overcome the genuine risk of arbitrary and capricious applications. 106 *N.J.* at 405–06. The global definition of capital murder, although somewhat narrowed by our subsequent decision in *Gerald,* in conjunction with the failure to narrow the class of death-eligible defendants through the consideration of aggravating factors, particularly the all-inclusive c(4)(c) factor, renders the jury's discretion standardless. *Id.* at 404 (Handler, J., dissenting).

Furthermore, the risk of arbitrariness due to the lack of guided jury discretion remains great because of the absence of proportionality review at the other end of the death-penalty tunnel. *State v. Williams*, 113 *N.J.* 393, 459 (1988) (Handler, J., concurring); *Gerald, supra,* 113 *N.J.* at 167 (Handler, J., concurring and dissenting); *State v. Koedatich*, 112 *N.J.* 225, 264–71 (1988) (Handler, J., dissenting). As I pointed out in dissent in *Ramseur,* proportionality review serves a unique and essential function in capital-murder prosecutions. It seeks to determine whether the death penalty is appropriate in a particular case by comparison with the punishment received by others who have committed the same crime. 106 *N.J.* at 407 (Handler, J., dissenting). As such, proportionality review acts "as a check against the random and arbitrary imposition of the death penalty" by an aberrant jury. *Id.* (quoting *Gregg v. Georgia,* 428 *U.S.* 153, 206, 96 *S.Ct.* 2909, 2940, 49 *L.Ed.*2d 859, 893 (1976)). Although our capital murder-death penalty statute, as originally enacted, required proportionality review, a subse-

quent amendment provides for such review only when requested. *L.*1985, *c.* 478. In my view, abolition of mandatory proportionality review becomes a fatal constitutional flaw in that there is now no reliable way to correct a capricious or discriminatory death sentence. I cannot believe that our Court will not insist on mandatory proportionality review, just as it has with respect to the defendant's entitlement to a direct appeal. *See State v. Koedatich,* 98 *N.J.* 553 (1984) (court denied defendant's motion to dismiss the appeal filed on his behalf by the Office of the Public Defender). We can expect no less under our State Constitution and accepted precepts of fundamental fairness.

The virtually unfettered power of prosecutors to select who is to be prosecuted for capital murder further exacerbates the risk of arbitrary enforcement of the death penalty and creates a major flaw in this statutory scheme. *Williams, supra,* 113 *N.J.* at 459 (Handler, J., concurring); *State v. Bey II,* 112 *N.J.* 123, 131 (1988) (Handler, J., dissenting); *Koedatich, supra,* 112 *N.J.* at 276 (Handler, J., dissenting); *Ramseur, supra,* 106 *N.J.* at 404–08 (Handler, J., dissenting). Our decision in *State v. Gerald, supra,* 113 *N.J.* 40, which established that intent to kill is an essential element of capital murder, does channel prosecutorial discretion to some extent. Nevertheless, the problem remains, in part because the definition of capital murder, by incorporating "knowing" murder, is over-inclusive and fails effectively to winnow out those crimes committed with a reckless culpability, *see id.* at 145–53 (Handler, J., concurring and dissenting), and, in part because a probable-cause determination is not required to support the prosecutor's decision to allege aggravating factors. Even more problematic, however, is the absence of uniform statewide standards to guide prosecutors in making such a momentous determination. Without such uniform standards to guide the selection process, the arbitrary enforcement of the death penalty is inevitable because the very pool of people selected to endure a capital trial at the initial stage of the prosecution is an arbitrarily-composed lot, reflecting determinations by individual prosecutors that may be con-

scientious but are nonetheless often highly subjective and speculative. *Ramseur, supra,* 106 *N.J.* at 405 (Handler, J., dissenting).

The risk of arbitrary enforcement of the death penalty due to the lack of a uniform statewide standard to guide prosecutors in their selection of capital defendants is heightened considerably when c(4)(c) is the sole aggravating factor relied on to transform a homicide into a capital case. I have repeatedly stressed that aggravating factor c(4)(c) is vague and entirely insufficient to provide effective guidance for prosecutorial or jury discretion. *Ibid.* In addition to being vague, this Court's interpretation of the c(4)(c) statutory terms of "torture," "aggravated battery," and "depravity of mind" acquires determinative status in only the most fact-sensitive type of case. Whether a defendant intended to inflict serious physical or mental pain in addition to the pain inherent in causing death can be proved or disproved only by the most searching inquiry into the particular facts of each case. The same fact-sensitive inquiry is required to determine whether the defendant had a motive for murder or was simply a sadistic pleasure-killer exhibiting depravity of mind. Other aggravating factors, such as whether a defendant has ever been convicted of murder (*N.J.S.A.* 2C:11–3c(4)(a)), or paid for or received payment for the murder (*N.J.S. A.* 2C:11–3c(4)(d) and (e)), or murdered a public servant (*N.J.S. A.* 2C:11–3c(4)(h)), do not involve the comparable degree of indeterminacy or the possibility of being supported by such a wide or subjective variety of evidence as the c(4)(c) factor. It is particularly important that these fact-sensitive determinations be guided and influenced by uniform and consistent standards; otherwise, there is simply no way to avoid the arbitrary enforcement and capricious application of the death penalty.

Not surprisingly, arbitrary results are indeed emerging. In several capital-murder appeals, the Public Defender has brought to our attention statistical evidence gathered in analyzing the administration of the capital murder-death penalty statute. Bienen, Weiner, Denno, Allison & Mills, "The Reimpo-

sition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 *Rutgers L.Rev.* 27 (1988) (hereinafter *Study* ). This study acknowledged by the Court in *State v. Koedatich, supra,* 112 *N.J.* at 256, reveals a clear differential in prosecutorial practices in our various counties; equally serious crimes are simply not prosecuted to equal degrees on a statewide basis.

For example, in this case, Keith Matulewicz was charged with shaking his infant daughter to death. The Somerset County Prosecutor sought the death penalty, alleging that "the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim." Yet the Public Defender's Study is replete with cases—all dealing with child abuse and child homicide, all determined to be supported by the c(4)(c) factor, and almost all far more gruesome than the sad death of Heather Matulewicz —in which the county prosecutor opted *not* to seek the death penalty.[2] *Study, supra,* 41 *Rutgers L.Rev.* at 294–98. The empirical evidence indicates that if the Matulewicz family lived in a county other than Somerset County, the defendant would

---

[2]Chapter VIII of the Study, entitled "Annotation of Death Possible Cases," identifies specific instances from a data base of 703 cases where the county prosecutor had a factual basis for serving a notice of factors and a discretionary decision was made *not* to serve such notice. The following cases dealt with child abuse, child homicide and aggravating factor c(4)(c): (1) Case No. 040—Essex County—22–year–old Puerto Rican woman killed nine-month-old daughter who died from either fractured skull or extensive burns from scalding; (2) Case No. 085—Camden County—20–year–old black woman with no prior record charged with death of her three-year-old son, the abuse of two other children, and the apparent death of a fourth infant whose body was never recovered; (3) Case No. 105—Cape May County—27–year–old white male with no prior record suffocated his three daughters; (4) Case No. 130—Salem County—25–year–old black male with no prior record hit two-year-old child with fist and switch causing liver and kidney damage, a ruptured spleen, and death; (5) Case No. 148—Mercer County—29–year–old white male shotgunned his wife and two children, age three and one years old, to death; (6) Case No. 257—Gloucester County—29–year–old white male struck fatal blow to head of two-year-old girl and suffocated her with doll. Evidence of previous child abuse was present.

not have had to answer capital charges and face the death penalty for the tragic killing of his daughter. It is this inconsistency in the selection of those eligible for death that mandates not only a uniform statewide standard to guide prosecutorial discretion, but also a more conscientious judicial overview and the use of a standard of pretrial review more stringent than the one set forth in *McCrary* and followed in this case.

Especially troublesome are the lax standards governing the competency of evidence at a *McCrary* hearing—in particular, the ready admission of hearsay evidence. In light of the numerous deficiencies inherent in the capital murder-death penalty statute—a nonexhaustive list would include unguided jury discretion, unfettered prosecutorial discretion, and the lack of proportionality review—loose evidential standards can only reinforce the tendency toward the arbitrary and capricious imposition of the death penalty. A more stringent standard regarding the competency of evidence should be adopted. At the very least, such evidence, when used to support an aggravating factor, should be "critically assessed by the court, and disregarded if too attenuated or only marginally reliable." *McCrary*, 97 *N.J.* at 148 (Handler, J., concurring).

### III.

Although I disagree with the standard of review set forth in *McCrary*, I concur with the majority that even under those permissive standards, the State has in this case failed to present sufficient evidence to warrant the submission of the c(4)(c) factor to the jury. Although the State originally argued that the defendant's conduct exhibited a depravity of mind, it relinquished that claim at oral argument, apparently conceding that the defendant had some motive for the assaultive acts that eventuated in the killing, or that the defendant was not a senseless or sadistic "thrill-killer." Therefore, the only issue is whether defendant's conduct constituted an "aggravated assault" or "torture" of the infant in his custody.

In order to satisfy constitutional standards, this Court adopted a narrowing construction of c(4)(c) in *Ramseur,* and in so doing, concluded that "society's concern, the community's concern, and the Legislature's concern, is to punish most harshly those who *intend* to inflict pain, harm, and suffering—in addition to death." 106 *N.J.* at 208. The focus of inquiry, therefore, is whether defendant intended to cause extreme physical or mental pain in addition to the pain inherent in causing death. Furthermore, in saying that the defendant must have "intended" such suffering, the state of mind required corresponds to the Code's definition of "purposeful." *See N.J.S.A.* 2C:2–2b(1). Thus, the gratuitous physical or mental suffering must be precisely what the defendant *wanted* to occur in addition to death. *Ramseur,* 106 *N.J.* at 208–09.

In order to satisfy c(4)(c) in this case, the State is therefore required to submit some evidence that the defendant wanted his daughter to suffer extreme physical pain in addition to the pain actually attendant to her death. As the majority points out, there is rarely ever direct evidence of a defendant's state of mind; instead, the intent to inflict gratuitous pain may necessarily be inferred from the circumstances of the murder. *Ante* at 194. The majority also provides examples in which the intent to inflict gratuitous pain can be inferred: returning to a dying victim to renew a vicious attack, inflicting wounds different in nature from the lethal injuries, "smoking-gun" statements by the defendant evidencing his or her intent to inflict such pain, and, in some cases, the method of killing may itself evince an intent to inflict extra or gratuitous pain. *Ante* at 200.

None of these circumstances are present in this case. The State, however, points to evidence that on a previous occasion defendant had abused the infant. The fallacy in this argument is that even if the prior conduct were admissible under *Evidence Rule* 55, for example, to show that defendant's shaking death of his daughter was not accidental or mistaken, it is in no way relevant to show that defendant intended to inflict extreme

pain in *addition* to that entailed in causing his daughter's death. It is in itself patently insufficient to convert this homicidal act into the aggravated form of murder that would warrant the death penalty. Thus, what is totally lacking in this case is any evidence of a distinct intent or state of mind necessary to escalate an assaultive killing to capital murder, namely, an intent to inflict extreme pain in addition to the intent to kill. Although Heather doubtlessly suffered physical pain at the hands of the defendant, nothing suggests that the defendant intended to inflict any pain other than that which inevitably occurs when murder is accomplished by shaking or battering.

I therefore concur in the majority's judgment that there is insufficient evidence to support the submission of the c(4)(c) factor to the jury.

HANDLER, J., concurring in the result.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.