651 A.2d 124

STATE OF NEW JERSEY, PLAINTIFF,
v. JOHN CHEW, DEFENDANT.

Superior Court of New Jersey
Law Division Middlesex County

Decided July 26, 1994.

*Thomas J. Kapsak,* Middlesex County Assistant Prosecutor, for plaintiff.

*Terrance N. Toner, Pamela L. Brause (Brause & Brause,* attorneys) for defendant.

HOFFMAN, J.S.C.

This case presents the unresolved issue of whether the capital aggravating factor of *N.J.S.A.* 2C:11–3c(4)(d) may apply to murders committed for the purpose of obtaining insurance proceeds, or whether it is limited to so-called "contract killers." Defendant John Chew has been charged with capital murder under *N.J.S.A.* 2C:11–3c(4)(d), which provides for capital punishment if "[t]he defendant committed the murder as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." The defense has moved to strike that aggravating factor on the grounds of insufficient evidence.

The facts alleged before the grand jury are as follows: On the morning of January 13, 1993, police found the body of Teresa Bowman in a car parked behind the Woodbridge Hilton Hotel. She bore a large wound to the neck, as well as smaller wounds on the hands and right forearm of the type known as "defense wounds." The knife used to kill her apparently broke during the attack, and a portion of the blade was found inside her jacket. Police traced the car to defendant John Chew, and ascertained that the victim had been his live-in girlfriend for approximately the two years prior.

Sergeant Geoffrey Kerwin testified before the grand jury that he notified the defendant in person of Teresa Bowman's death. While speaking to Chew, Sergeant Kerwin noticed several cuts on his chin, hands and chest. Chew attributed the cuts to slipping on a broken drinking glass. During the course of the interview, the officers discovered that Chew had taken out a $250,000 life insurance policy on Teresa Bowman in June of 1991, with himself as the beneficiary. Sergeant Kerwin testified that he subsequently discovered that the premium payments for the policy had been deducted from Teresa Bowman's checking account. In December of 1992, a premium payment was rejected for insufficient funds.

On December 31, just two weeks before the murder, Chew appeared at the insurance agent's home offering to pay in cash, and expressing great concern that the policy should not lapse.

The defendant's son, Robert Chew, testified that on several occasions the defendant had asked him to kill Teresa Bowman for her insurance money, and had even discussed specific methods with him. George Tilton, a friend and co-worker of the defendant, testified that as soon as Chew obtained the life insurance policy for Teresa Bowman he began to talk about killing her. Chew spoke about it regularly, and at one point offered Tilton $10,000 to commit the murder. Dennis Smith, another of Chew's co-workers, testified that shortly after obtaining the policy the defendant told him "I'm going to knock the bitch off." David Charette, the defendant's brother-in-law, testified that in late 1992 Chew told him that he was planning a "$250,000 scam" to solve his money problems.

## I

The grand jury performs an accusative rather than an adjudicatory function, and thus operates with much laxer standards of proof than a trial jury does. An indictment that appears sufficient on its face will stand if the State presented at least some evidence to the grand jury as to each element of the prima facie case. *State v. Vasky,* 218 *N.J.Super.* 487, 528 *A.*2d 61 (App.Div. 1987). A defendant seeking to challenge an aggravating factor as insufficiently supported by the evidence bears the burden of showing that the evidence which would support such a claim is "clearly lacking". *State v. Matulewicz,* 115 *N.J.* 191, 196, 557 *A.*2d 1001 (1989); *State v. McCrary,* 97 *N.J.* 132, 142, 478 *A.*2d 339 (1984). I find that the State presented ample evidence that the defendant intended to murder Teresa Bowman for the purpose of obtaining the benefits of her insurance policy.

## II

However, while there is sufficient evidence to proceed to trial on the theory of murder for insurance money, a more basic question

remains unaddressed: Does such a killing constitute a capital crime. As noted above, *N.J.S.A.* 2C:11–3c(4)(d) establishes a capital aggravating factor when "[t]he defendant committed the murder as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." The very next provision, subsection (e), makes it an aggravating factor if "[t]he defendant *procured* the commission of the offense by payment or promise of payment of anything of pecuniary value." (Emphasis added.) The question then, is whether these provisions only apply to situations where a person is hired to kill another, or whether they can be read more expansively, to include other murders committed for the purpose of financial gain, in this instance, to obtain insurance proceeds.[1]

The New Jersey Supreme Court has given only a cursory examination of *N.J.S.A.* 2C:11–3c(4)(d), and has never addressed the question of whether it applies beyond the limited class of hired killers. The entire discussion of the scope of subsection (d) appears in two paragraphs of the decision in *State v. Clausell*, 121 *N.J.* 298, 580 *A.*2d 221 (1990). In *Clausell*, the defendant challenged the jury charge, claiming that simply referring to the c(4)(d) aggravating factor as "murder for hire" was an oversimplification.

The Court stated that:

> The essence of c(4)(d) is that the murder was committed in exchange for something of value. Accordingly, the court explained, without objection, that factor was "statutory language saying [defendant] was hired to do the killing." On remand, if necessary, the court should expand that statement by telling the jury that it must specifically find that defendant either received payment, or expected to receive payment, for having killed [the victim].
>
> [*Id.* at 344, 580 *A.*2d 221.]

---

[1] This opinion seeks only to resolve the applicability of subsection 3 c(4)(d) to murders committed for insurance money. It does not attempt to delineate the range of crimes which could fit the aggravating factor. Application of the provision to other crimes, for example an heir who murders to collect an inheritance, is best left to another day.

This decision provides rather limited guidance. In *Clausell*, the defendant had been hired to kill the victim, and the Court simply presented some guidance as to how to explain the aggravating factor to the jury in that situation. The general statement that c(4)(d) refers to murder in exchange for something of value still leaves substantial room for interpretation.

■ In general, penal statutes are to be construed strictly, and in favor of the defendant. *State v. Galloway*, 133 *N.J.* 631, 628 *A.2d* 735 (1993). However, any such construction must conform to the intent of the Legislature. *State in the Interest of M.T.S.*, 129 *N.J.* 422, 609 *A.2d* 1266 (1992); *State v. Bridges*, 131 *N.J.* 402, 621 *A.2d* 1 (1993). In determining legislative intent, courts are to consider the language of the statute, policy, legislative history and concepts of reasonableness. *No Illegal Points v. Florio*, 264 *N.J.Super.* 318, 624 *A.2d* 981 (1993).

■ The language of the statute does not yield firm direction on this issue. The parallel structure of the two subsections may suggest that they extend only to defendants hired to commit a murder or to those who hire another to commit a murder. Under this interpretation, subsection (e) makes the death penalty applicable to one who hires another to kill. Subsection (d) then, refers to those who actually commit the killing, with the first clause, "as consideration for the receipt," referring to hired killers who receive payment in advance, and the second provision, "or in expectation of the receipt," to those who are promised payment after the commission of the crime.

However, the use of the term "consideration" in the first clause of subsection (d) implies a broader reading. *Black's Law Dictionary*, Fourth Edition, defines consideration as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person ... as an inducement to the promisor." Thus, the commission of a murder to induce subsequent payment would constitute consideration. However, a *promise* to commit murder upon receipt of advance payment, made in order to induce that payment, would also constitute consideration. Under this reading,

the term "as consideration for" in the first clause of subsection (d) provides a full parallel to the two-part structure of subsection (e) on its own by encompassing defendants who kill for advance payment as well as those who kill upon the promise of later payment. The second clause, "in expectation of the receipt of anything of pecuniary value," can then be read to authorize the imposition of capital punishment for other scenarios beyond that of murder for hire. The broad language, "*anything* of pecuniary value," certainly supports the wider interpretation to include murders committed for the purpose of obtaining insurance benefits.

I believe that the wider interpretation of *N.J.S.A.* 2C:11–3 c(4)(d) better serves the policy behind the death penalty statute, and is more consistent with the intentions expressed in the legislative history. During the hearings on the statute in 1982, the lawmakers did not directly address the issue of murder for insurance proceeds. In fact, the only significant discussion for subsections (d) and (e) centered around the question of whether to adopt subsection (e), extending the death penalty to a person who procures a killing.[2] Nonetheless, the general debate reveals the legislators' purpose in reinstating the death penalty. The supporters of reinstatement considered it a necessary public policy measure in the struggle to stem the increasing rate of crime. In justifying their position, they cited the need for increased deterrence and as well as significant retribution. Many of the legislators, though aware of the statistical evidence to the contrary, expressed a basic intuition that the death penalty would have a deterrent effect on crime. Others, though uncertain that capital punishment would actually prevent crime, considered it a proper

---

[2] In choosing to adopt subsection (e), the legislators indicated that they considered the culpability of the person who procured the crime equivalent to that of the actual killer. Thus the provision evinces an expansive approach to the boundaries of the capital punishment statute.

measure of retribution. They deemed it a necessary expression of societal outrage at violent crime.[3]

Expanding subsection (d) beyond hired killers comports with both of these underlying premises. For the first factor, deterrence, those who kill for financial gain seem the most likely to actually be deterred by the increased penalty of capital punishment, because they plot their crimes in advance. At the legislative hearings, it was remarked that a significant portion of killings are unresponsive to increased penalties because they occur in the heat of the moment, without consideration of the consequences. This position finds support in the social research done on the issue, most of which reaches the same conclusion on the spontaneous nature of homicide in our society.

> Much of the killing of one person by another is impulsive. It is an outburst that is purely expressive, such as results from a barroom brawl or a domestic fracas. This kind of killing is not planned, but it is provoked.
> . [Gwynn Nettler, *Social Concerns*, 276 (1976).]

The standard jury charge also recognizes the impulsive nature of many crimes, requiring a judge to explain that the requisite mental conditions for purposeful conduct may arise at any time up to the actual moment of the crime.

*N.J.S.A.* 2C:11–3 c(4)(d) and (e), however, anticipate a more cold-blooded, calculated sort of crime than the usual purposeful conduct. These are the type of offenses that could form the basis for a conviction under the old legal concept of lying in wait.[4] They generally differ from the so-called "crimes of passion" which form the basis for most capital murders. In fact, these killings do not

---

[3] It should be noted that during the course of the debate, the legislators referred to subsections (d) and (e) as the "murder for hire" provisions. However, they did not directly consider the parameters of these subsections, and from the context of the discussions, I believe that this was more a form of verbal shorthand than a qualitative judgment of content.

[4] Under this doctrine, a killing committed by "lying in wait," *i.e.*, by means of a pre-arranged concealment or ambush, could constitute murder in the first degree, even without a separate showing of premeditation and deliberation. *See* Annotation, *Homicide: What Constitutes Lying in Wait*, 89 *A.L.R.*2d 1140 (1961).

stem from some powerful, visceral emotion, but rather from greed and expedience.

Because of this difference, murders prompted by financial motives may be more responsive to the deterrent aspect of the penal code, and to capital punishment in particular. Most social scientists contend that the death penalty does not deter crime.[5] However, even opponents of capital punishment concede that a criminal whose motive is financial gain and who takes the time to plan a murder in advance seems the most likely to weigh the consequences of possible apprehension, and thus is most susceptible to the deterrent impact of a severe array of sanctions.[6] The possibility of being put to death rather than sentenced to a prison term might actually cause such criminals to refrain from killing.

The broader reading also serves the second, retributive goal of expressing societal outrage. At the legislative hearings, one witness from the Office of the Attorney General stated that "the only way society demonstrates deep respect for human life is by exacting the highest price possible for the knowing, willful, calculated, cold blooded taking of a human life." (at 5). This language provides an exemplary description of those who kill for money. Few crimes display a more callous disregard for human life than the premeditated decision to seek profit by way of homicide. It evidences an abandonment of all of the rules that society has constructed to maintain communal life, and warrants the fullest condemnation and retribution. In light of the Legislature's twin motivations in reinstating the death penalty, its intent is best served by reading the broad language of subsection (d) to encompass not only contract killings, but also murder committed to obtain insurance proceeds.

---

[5] *See* James Hennessy & Nathaniel Pallone, *Criminal Behavior* 216–223 (1992) for a review of the significant studies done to date.

[6] *See* 55 Michael Faia, *Willful, Deliberate, Premeditated and Irrational: Reflections on the Futility of Executions,* State Government, Issues 1, 16 (1982).

## III

The courts of other jurisdictions with similar capital punishment statutes have adopted this wider interpretation. The Arizona statute resembles that of New Jersey, authorizing capital punishment for the crime of murder if the defendant "committed the offense in expectation of the receipt of something of pecuniary value." *A.R.S.* sec. 13–703(f)(5). The Arizona Supreme Court has ruled that the statute applies to a murder committed in order to obtain insurance benefits. In *State v. Apelt*, 176 *Ariz.* 349, 861 *P.*2d 634 (1993) the Court held that "the evidence showed beyond a reasonable doubt that the defendant killed [the victim] in order to receive the $400,000 in insurance proceeds. No further discussion is necessary." *See also State v. Fierro*, 166 *Ariz.* 539, 804 *P.*2d 72 (1990); *State v. Comer*, 165 *Ariz.* 413, 799 *P.*2d 333 (Ariz.1990) *cert. denied*, 499 *U.S.* 943, 111 *S.Ct.* 1404, 113 *L.Ed.*2d 460 (1991).

California provides for the death penalty if the "murder was intentional and carried out for financial gain." *Cal.Penal Code* sec. 190.2(a)(1). In *People v. Bigelow*, 37 *Cal.*3d 731, 735, 209 *Cal.Rptr.* 328, 333, 691 *P.*2d 994, 999 (1984), the California Supreme Court interpreted this provision to mean that the victim's death is the consideration for or an essential prerequisite to the financial gains sought by the defendant. Subsequently, the court found that a murder committed to obtain the proceeds of a life insurance policy falls within the interpretation outlined in *Bigelow*. It upheld the application of the death penalty provisions to such a killing. *People v. Hamilton*, 48 *Cal.*3d 1142, 259 *Cal.Rptr.* 701, 774 *P.*2d 730 (Cal.1989), *reh'g denied, cert. denied, Hamilton v. California* 494 *U.S.* 1039, 110 *S.Ct.* 1503, 108 *L.Ed.*2d 638, *reh'g denied*, 495 *U.S.* 924, 110 *S.Ct.* 1961, 109 *L.Ed.*2d 323 (1990).

The capital punishment provisions of the Delaware Penal Code apply to cases in which "the murder was committed for pecuniary gain." 11 *Del.C.* 4209(e)(1)(*o*). In *McBride v. State*, 477 *A.*2d 174 (Del.Super.1984), the defendant was convicted of killing her husband in order to obtain the benefits from his insurance policy.

She was deemed eligible for the death penalty under section 4209(e)(1)(*o*), although the jury imposed a life sentence instead.

In light of the language of the statute, the legislative history, policy concerns, and concepts of reasonableness discussed above, as well as the support from other jurisdictions, I find that *N.J.S.A.* 2C:11–3c(4)(d) applies to murders committed for the purpose of obtaining benefits from the victim's life insurance policy. The State has presented sufficient evidence to proceed to trial on the theory that the defendant did so here. The motion to dismiss the aggravating factor is denied.