293 N.J. Super. 330 (1995)
680 A.2d 800
STATE OF NEW JERSEY, PLAINTIFF,
v.
WILLIAM MENTER, DEFENDANT.
Superior Court of New Jersey, Law Division Hudson County.
October 30, 1995.
*334 Patrick R. Raviola, Assistant Prosecutor, and Jeffrey S. Ziegelheim, Assistant Prosecutor for plaintiff (Carmen Messano, Hudson County Prosecutor, attorney, Mr. Raviola and Mr. Ziegelheim of counsel and on the brief).
Verna G. Leath, Deputy Public Defender, and E. Carl Broege, Jr., Assistant Deputy Public Defender, for defendant (Susan L. Reisner, Public Defender, attorney, Ms. Leath and Mr. Broege of counsel and on the brief).

OPINION
JAMES T. O'HALLORAN, J.S.C.
Defendant William Menter has made motions to strike two of the aggravating factors which the State intends to prove at the penalty phase of trial to support a sentence of death. See State v. McCrary, 97 N.J. 132, 478 A.2d 339 (1984). Specifically, defendant contends that there is insufficient evidence to support a finding by the jury that he murdered the victims while attempting *335 to commit an aggravated sexual assault upon Joann Roberts. N.J.S.A. 2C:11-3c(4)(g).
Defendant also maintains that there is inadequate evidence to support a finding that the alleged murders "involved torture, depravity of mind, or an aggravated assault...." N.J.S.A. 2C:11-3c(4)(c). The State charges this aggravating factor under two theories. First, the State asserts that defendant intended to, and did in fact, cause Latisha Roberts (who was not a victim) extreme mental suffering by killing her family. Second, the State submits that defendant intended to, and did in fact, cause extreme physical or mental suffering  in addition to death  when he killed Joann, Isabella and Shakia Roberts.
Defendant has also filed a motion to dismiss counts four through nine[1] of the indictment. He contends that there was inadequate evidence presented to the grand jury to support these counts. He further asserts that the evidence submitted was deficient in that it was hearsay. Finally, he argues that the prosecutor presented *336 the charges to the grand jury in such a way that the panel unreasonably "deferred to the prosecutor's judgment." Defendant's Brief in Support of Motion to Dismiss Counts 4-9, at 2.
First, this court denies defendant's motion to strike aggravating factor three (attempted aggravated sexual assault). Specifically, this court finds that "a reasonable fact finder could ... conclude that [the] aggravating factor exists." McCrary, supra, 97 N.J. at 144, 478 A.2d 339. "Defense motions to strike an aggravating factor should be brought only when the supporting evidence is so thin, so lacking, so weak as to leave no room in the minds of a reasonable fact-finder as to the existence of that aggravating factor." Id. at 147, 478 A.2d 339 (emphasis added). Clearly, that is not the case here. The State is ordered to provide defendant with a bill of particulars detailing the charge of attempted aggravated sexual assault. R. 3:7-5.
Defendant's motion to dismiss counts four through nine of the indictment is similarly denied. This court finds that the evidence submitted to the grand jury was sufficient to sustain the indictment. Furthermore, that evidence was not incompetent because much of it was based upon hearsay. Both the New Jersey and United States Supreme Court have long held that an indictment based on hearsay is valid. State v. Dayton, 23 N.J.L. 49, 56 (Sup.Ct. 1850); Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397, 402-03, reh'g denied, 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956) (an indictment may be returned on the basis of hearsay).
This court also finds that the challenged counts of the indictment were not the result of the prosecutor's exercise of undue influence over the grand jury. A prosecutor's conduct is granted a presumption of validity. In re Investigation Regarding Ringwood Fact Finding Comm., 65 N.J. 512, 516, 324 A.2d 1 (1974); State v. Laws, 51 N.J. 494, 242 A.2d 333 cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968). Defendant's allegation that the prosecutor improperly impelled the grand jury to *337 return an indictment for attempted aggravated sexual assault is unfounded. This court finds that the prosecutor exercised his charging duty in good faith.
Finally, defendant's motion to strike aggravating factor two (N.J.S.A. 2C:11-3c(4)(c)) is denied in part and granted in part. The State is restricted to the theory that William Menter intended to, and did in fact, cause Latisha Roberts extreme mental suffering when he killed her family. The State is ordered to supply defendant with a bill of particulars clearly delineating that theory. R. 3:7-5.
However, this court rejects the State's second theory. There is no evidence that defendant "intended to inflict pain incremental to that attributable to the act of killing." State v. Erazo, 126 N.J. 112, 138, 594 A.2d 232 (1991). As such, the State is precluded from asserting at trial that defendant intended to cause Joann, Isabella and Shakia Roberts extreme physical or mental suffering  in addition to death.

I

Evidence Submitted by the State
The facts as alleged before the grand jury, and elicited from witnesses, follow. Latisha Roberts (Latisha)[2] had been dating defendant, William Menter, sporadically for five years. On July 15, 1994, Menter proposed marriage to Latisha.
Latisha was not receptive. Apparently, she had wanted to terminate her relationship with Menter for some time. She had hesitated because she feared defendant. Nevertheless, on July 15, Latisha declined defendant's offer of marriage and informed Menter that she wanted to end their relationship. The next day, she went to stay with friends, hoping to avoid defendant.
*338 Menter spent much of July 16 attempting to locate Latisha. He went to several of her friends' homes to inquire as to her whereabouts. He was unsuccessful. Eventually, defendant arrived at Latisha's home.
Latisha lived with her mother, Joann Roberts (Joann), and her grandmother, Isabella Roberts (Isabella), at 165 Wegman Parkway. On the evening of July 16, three of Latisha's cousins were spending the night at her house. They were Shakia Roberts (Shakia), age seven; Omar Roberts (Omar), age twelve; and their younger brother Zaire Roberts (Zaire), age two.
Omar was watching television in the living room when he heard a knock at the front door. His aunt, Joann, answered the door. Defendant (whom Omar recognized as his cousin Latisha's boyfriend William) entered. He asked to speak with Joann alone in the kitchen. A short time later, Omar heard something fall to the floor.
Omar arose from the couch and went to the kitchen. When he entered, he observed his Aunt Joann lying on the floor. Defendant was standing over her. Omar shouted: "[g]et off my aunt."
At that point, defendant grabbed Omar by the ear and began to slash his throat with a box cutter (razor). Thereafter Isabella, who had been sleeping, came out of her bedroom and towards the kitchen. Defendant released Omar and began slashing Isabella's throat.
Omar ran down the hallway and hid under his Aunt Joann's bed. His sister Shakia, who had been sleeping in the bed, awoke. Omar warned his sister to stay away from William. Shakia ran out into the hallway. Omar heard her shout: "William, I didn't do anything." Omar further recounted that his grandmother Isabella, whom he heard gasping for air, was attacked again.
Shakia reentered the bedroom bleeding from her neck. Defendant followed her. Defendant told Shakia to "lay on the bed and I'll take you to the hospital." He proceeded to slash her throat again, pushing her body under the bed where Omar was hiding. *339 Defendant told Omar that "this shouldn't have happened." He then grabbed Omar and slashed his throat again.
At some point after the attack in the bedroom, Omar heard defendant speaking on the telephone. He heard him say: "Michelle[3], don't do this to me. Where is Latisha?" After this conversation defendant left the bedroom and later, the house.
Omar's next recollection is of a flashlight shining through the bedroom window. He exited the bedroom and fell into the arms of Jersey City Police officers who had broken into the house after observing Joann Roberts' body lying on the kitchen floor.
In addition to the wounded Omar (who survived), the officers found the bodies of Joann (on the kitchen floor), Isabella (who had been dragged into the bathroom), and Shakia (who had been shoved under the bed where Omar had been hiding).
Joann was found lying on her back with her legs spread apart. Her shorts and panties were pulled down around her left ankle, exposing her genitalia. Her blood stained shirt was pushed up, partially revealing her breasts. Subsequent forensic tests revealed no evidence indicative of a completed sexual assault.
The officers also found two styrofoam plates at the crime scene.
*340 The following message was written on one plate: "Tecia[4], never fuck with me in life." The other plate read: "[y]ou may have cracked my world, but I devastated yours, go to hell, I'll be waiting for you."

II

Procedural History
On October 21, 1994, William Menter was indicted for the murders of Joann, Isabella, and Shakia. He was also charged with the attempted murder of Omar. Additional charges included attempted aggravated sexual assault upon Joann and the felony murders of Joann, Isabella, and Shakia (all predicated upon the attempted aggravated sexual assault of Joann).
Defendant was arraigned before this court where he entered pleas of not guilty to all charges. At arraignment, the State provided defendant with a notice of aggravating factors intended to support a sentence of death for the three murders. Those factors were:
1. Each of the murders was committed while the defendant was engaged in the commission of the other murders. N.J.S.A. 2C:11-3c(4)(g).
2. The offenses were outrageously or wantonly vile, horrible or inhuman in that they involved torture, depravity of mind or an aggravated battery to the victims. N.J.S.A. 2C:11-3c(4)(c).
3. The offenses were committed while the defendant was engaged in the commission of an attempted [aggravated] sexual assault. N.J.S.A. 2C:11-3c(4)(g).
4. The offenses were committed in a matter wherein defendant purposely created a grave risk of death to another. N.J.S.A. 2C:11-3c(4)(b).
The State has since withdrawn the fourth aggravating factor, acknowledging that the evidence did not support it. Defendant has not challenged the first aggravating factor in the instant set of motions.
Defendant has, however, challenged the second and third aggravating factors. He has filed motions to strike these factors *341 pursuant to State v. McCrary, 97 N.J. 132, 478 A.2d 339 (1984). He has further moved to dismiss counts four through nine of the indictment, arguing, among other things, that the State presented insufficient and inappropriate evidence to the grand jury to sustain these counts.

III

Motion to Strike Third Aggravating Factor
First, this court will address the validity of the third aggravating factor, i.e., that the offenses were committed while defendant was engaged in the commission of attempted aggravated sexual assault. N.J.S.A. 2C:11-3c(4)(g). As such, the initial question is whether a reasonable fact-finder could conclude that the aggravating factor exists. McCrary, supra, 97 N.J. at 144, 478 A.2d 339.
Above all, this court is mindful of the high standard that defendant must meet in order to strike an aggravating factor prior to trial. McCrary places the burden of proof squarely upon defendant. "A defendant who challenges the sufficiency of the evidence to support an aggravating factor bears the burden of proving that contention." Id. at 147, 478 A.2d 339.
To counter such a motion, the prosecutor "[need not] prove his case before trial. [He need only present] some evidence that justifies the submission of the specified aggravating factors to the trier of fact at the sentencing phase of the case...." Id. at 143, 478 A.2d 339 (emphasis added).
This court is satisfied that the State has presented some evidence that William Menter attempted an aggravated sexual assault upon Joann Roberts. The final resolution of the question of whether he did in fact commit the crime is for the jury. They are the final arbiters of the facts, and it is before them that the State must prove its case beyond a reasonable doubt. The standard here is considerably less strenuous.
*342 The evidence that the State presented to support the attempted aggravated sexual assault aggravating factor is recited above. Specifically, the State offered the statement of Omar. He recounted that he entered the kitchen and shouted to the defendant: "[g]et off my aunt [Joann]." He further stated that defendant was "standing there and my aunt was on the floor." When asked when he saw "how she was," Omar responded that he did not see "how she was" until "the cops came." It is presumed that "how she was" refers to the state of Joann's body.
The statement of Omar is somewhat inconclusive. What is more conclusive are photographs of Joann's body, as it was found at the crime scene. This court has had the opportunity to view these photographs. They reveal the body of Joann Roberts. She is lying on her back. Her shorts and panties are pulled down to her left ankle. Her legs are spread apart. Her shirt is pushed up. Her breasts are partially exposed.
This court is satisfied that these photographs constitute "some evidence that justif[y] the submission of the [third] aggravating factor ... to the trier of fact at the sentencing phase of [this] case," (if the case proceeds to that point). McCrary, supra, 97 N.J. at 143, 478 A.2d 339. Whether a jury will be satisfied beyond a reasonable doubt that the State has proven the aggravating factor is an entirely different matter. That is for the jury to decide. This court will not usurp its function.

IV

Analysis of Attempted Aggravated Sexual Assault
To fully comprehend and examine the soundness of the third aggravating factor, it is necessary to review the law of attempted aggravated sexual assault.[5] Unfortunately, there is sparse treatment of this crime in New Jersey case law.
*343 The elements of the crime were long ago set forth in State v. Swan, 131 N.J.L. 67, 34 A.2d 734 (E. & A. 1943).[6]
This court has laid down the rule that "an attempt to commit a rape does not begin with the act of penetration, but with the primary attack upon the woman made for the purpose of carrying out the intent: and this intent may be formed at the very moment of the attack." State v. Knight, 96 N.J.L. 461, 470 [115 A. 569] (E. & A. 1921). An attempt to commit a crime has three elements: first, the intent; second, performance of some act towards commission of the crime; and third, the failure to consummate the commission of the crime. State v. Schwarzbach, 84 N.J.L. 268 [86 A. 423] (E. & A. 1913).
[Swan, 131 N.J.L. at 69, 34 A.2d 734 (emphasis added).]
As in the instant case, the defendant in Swan overpowered his victim and stripped off her clothing. After severely beating the victim, Swan threw her body out of the upstairs window of the movie theater where he had assaulted her. Her nude body was found the next day. Swan, 131 N.J.L. at 68, 34 A.2d 734.
The State did not claim that the defendant raped the victim. However, the State did contend that the evidence supported defendant's conviction for attempted rape. The high court agreed.

*344 Applying ... settled rules of law, it is entirely clear to us that under the proofs and the inferences that may properly be drawn therefrom the jury was fully justified in finding that Swan intended to rape this girl and that his intention was followed by definite overt acts, namely, his actions when accosting her and the entire circumstances, including the taking of the girl after she was overpowered to a secluded spot back stage and the tearing off of her clothing. The verdict was not, we conclude, against the weight of the evidence.
[Id. at 69, 34 A.2d 734 (emphasis added).]
The defendant's death sentence for murder was affirmed.

IV(A)

Is there "some evidence" of intent?
Mindful of Swan's definition of attempted rape, the next question is whether there is "some evidence" to suggest that defendant may have formed the intent to commit an aggravated sexual assault upon Joann Roberts. McCrary, supra, 97 N.J. at 143, 478 A.2d 339; Swan, 131 N.J.L. at 69, 34 A.2d 734. Intent is "a mental attitude which can seldom be proved by direct evidence, but must ordinarily be proved by circumstances from which it may be inferred. [It is] a state existing at the time a person commits an offense and may be shown by act[s], circumstances and inferences deducible therefrom." Black's Law Dictionary 810 (6th ed. 1990) (emphasis added) (citations omitted).
Swan holds that intent to rape may be inferred from the initial assault upon a woman. This proposition has its basis in the common law. Prior to the enactment of N.J.S.A. Title 2C in 1979, New Jersey's criminal statutes were derived from the common law. As such, there were separate crimes of attempted rape and assault with intent to rape. "Any person who commits an assault with intent to ... rape ... is guilty of a high misdemeanor." N.J.S.A. 2A:90-2, repealed by N.J.S.A. 2C:12-1; see, e.g., State v. Gibbs, 79 N.J. Super. 315, 320-21, 191 A.2d 495 (App.Div. 1963) (defendant's conviction for assault with intent to rape sustained where he beat and stripped victim but failed to penetrate her).
*345 With the abolishment of common law crimes and the institution of the criminal code in 1979, assault with intent to commit rape was eliminated.[7] As such, assault with no other action is now covered by N.J.S.A. 2C:12-1 (assault statute).
Nevertheless, the reasoning of Swan remains. An assault, coupled with other actions intimating attempted rape, is a constituent element of attempted rape. Accordingly, Swan holds that when the second (performance of some act toward commission of the crime) and third (failure to consummate commission of the crime) elements of attempted rape are joined with an assault (indicating intent), the crime is complete. Swan, supra, 131 N.J.L. at 69, 34 A.2d 734.
In the instant case, there is obvious evidence that defendant assaulted Joann. Intent can be inferred from this assault and the actions which allegedly followed (i.e., the removal of the panties and the shorts).

IV(B)

Is there "some evidence" indicating performance of an act toward the commission of aggravated sexual assault?
Having addressed the element of intent, the next question is whether there is "some evidence" demonstrating the accomplishment of an act towards the commission of aggravated sexual assault (the second element of attempted aggravated sexual assault). McCrary, supra, 97 N.J. at 143, 478 A.2d 339; Swan, supra, 131 N.J.L. at 69, 34 A.2d 734. The fact that Joann Roberts' body was found with her legs spread apart; with her *346 panties and shorts pulled down to her left ankle; and with her shirt pushed up partially revealing her breasts is clear evidence of the performance of some act towards the commission of the crime of aggravated sexual assault.
Our Supreme Court has sustained a conviction for aggravated sexual assault in the context of a capital case where the victim's body was found in a somewhat similar state. State v. Zola, 112 N.J. 384, 548 A.2d 1022 (1988) (sentence of death reversed on other grounds), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989). The aggravated sexual assault formed the basis for one of the aggravating factors during the sentence phase. N.J.S.A. 2C:11-3c(4)(g).
In Zola, the victim's badly mutilated body was found on a bed, with her arms and legs tied spread eagle. She was naked with the exception of a girdle. "No sign of trauma to the victim's sexual organs was detected, nor was semen found in the victim's body." Id. at 392, 548 A.2d 1022. On appeal, the defendant challenged the legitimacy of expert scientific testimony which concluded that his saliva was present in the victim's vagina. The Supreme Court found a sufficient scientific basis for such a conclusion. Id. at 412, 548 A.2d 1022.
Although the presence of saliva in the victim's vagina differentiates Zola from the instant case, it can be argued that had saliva not been found, the Supreme Court would have sustained a conviction for attempted aggravated sexual assault. Such musings are far from conclusive, yet they prove necessary when the issue of attempted aggravated sexual assault as an aggravating factor has yet to be addressed by our Supreme Court.
In the end, however, the all but naked body of Joann is much more than "some evidence" indicating performance of an act towards the commission of aggravated sexual assault. It is compelling evidence; considerably more than is required by McCrary. See McCrary, supra, 97 N.J. at 143, 478 A.2d 339.

*347 IV(C)

Was there a failure to complete the crime?
The final question, then, is whether there was a failure to consummate the crime of aggravated sexual assault. Swan, supra, 131 N.J.L. at 69, 34 A.2d 734. The lack of forensic evidence indicating a completed sexual assault amply demonstrates this element of the crime.
More importantly, it is the State's theory that defendant was interrupted while attempting an aggravated sexual assault upon Joann Roberts.
In this case, after Omar Roberts heard the sound that drew him from the kitchen, he then came out and said: "Yo. Hey, get off of my aunt. Stay away from my aunt." At that point Menter's attention is then diverted from Joann Roberts to Omar Roberts and then ultimately to Isabella Roberts and Shakia Roberts.
[Transcript of Hearing on Pretrial Motions, Assistant Prosecutor Patrick R. Raviola; T34:13-18.]
Again, though not entirely conclusive, the State has presented "some evidence" to sustain this theory. The statement of Omar recounts that he entered the kitchen after hearing something hit the floor. The State alleges that Omar interrupted defendant while he was engaged in a "substantial step in a course of conduct planned to culminate in" the commission of the crime of aggravated sexual assault. N.J.S.A. 2C:5-1a(3). Again, the New Jersey Supreme Court has indicated that "the procedure ... envisioned [in McCrary] does not require the prosecutor to prove his case before trial." State v. Matulewicz, 115 N.J. 191, 196, 557 A.2d 1001 (1989).
Moreover, there is evidence to support the State's assertion that the attempted aggravated sexual assault took place concomitant with the initial attack upon Joann, rather than after her murder. The autopsy report of Joann reveals that her shorts and panties were "only minimally stained with blood, [with] almost no blood seen on the panties." Autopsy Report of Joann Roberts, at 1. Given the amount of blood splattered around the kitchen where her body was found, the fact that her panties and shorts were *348 relatively clean suggests that they were pulled down early in the attack, rather than afterwards (when they would already be bloodstained).[8] This would be consistent with the State's theory that defendant was already engaged in an attempted aggravated sexual assault upon Joann when he was interrupted by Omar.

IV(D)

Bill of Particulars
This court will hold the State to its "interruption theory." The State will not be allowed to change theories if the evidence does not bear out its original supposition at trial. "Trial fairness is `a categorical imperative' for death-penalty prosecutions. No one can face capital sentencing without adequate notice of the charges against him." State v. Dixon, 125 N.J. 223, 264, 593 A.2d 266 (1991) (citations omitted); State v. Williams, 93 N.J. 39, 61, 459 A.2d 641 (1983); see Lankford v. Idaho, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991).
Accordingly, this court orders the State to provide defendant with a bill of particulars. "A bill of particulars shall be ordered by the court if the indictment ... is not sufficiently specific to enable the defendant to prepare a defense." R. 3:7-5. The bill of particulars shall clearly delineate the State's theory with respect to the charge of attempted aggravated sexual assault. It shall also specify what the State intends to prove beyond a reasonable doubt. The State will not be allowed to deviate from this theory at trial.

*349 V

Analysis of Attempted Sexual Assault in Other Jurisdictions
The above conclusions are supported by the case law of several other jurisdictions. Given the dearth of New Jersey case law on attempted aggravated sexual assault, a review of the law of other states is clearly in order.
The most informative cases hail from North Carolina. In recent years, the Supreme Court of North Carolina has addressed the issue of the sufficiency of evidence to support a charge of attempted rape three times. Each time, the court was confronted with facts strikingly similar to those alleged in the instant case. Each time the court held that the evidence was sufficient.
The North Carolina Supreme Court most recently addressed the issue at hand in State v. Carter, 338 N.C. 569, 451 S.E.2d 157 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2256, 132 L.Ed.2d 263 (1995). In that case, the murder victim's left pant leg was pulled off; her panties were down; and her brassiere was above her breasts. There was no trauma to the vagina or genitalia and no evidence of a completed sexual assault. Id. 451 S.E.2d at 162.
After his conviction for capital murder, the defendant (as here) argued that there was insufficient evidence to support the aggravating circumstance that the murder was committed during an attempted rape. N.C. Gen. Stat. § 15A-2000(e)(5)[9]. The court disagreed.

*350 [T]he evidence here is sufficient to support the inferences that the defendant knocked [the victim] to the ground and forcibly removed her pants and panties in an attempt to rape her. Thus, we conclude the evidence in this case supports the submission of the aggravating circumstance that the murder was committed during the course of an attempted rape.

[Carter, supra 451 S.E.2d at 176 (emphasis added).]
Likewise, the evidence submitted in the instant case "is sufficient to support the inferences that [William Menter] knocked [Joann Roberts] to the floor and forcibly removed her pants and panties in an attempt to rape her." Ibid.
In another North Carolina case, the facts were all but identical to the case at hand. In State v. Harris, 319 N.C. 383, 354 S.E.2d 222 (1987), "the body [of the victim] was on its back and disrobed from the waist down. The legs were spread apart." Harris, supra, 354 S.E.2d at 223.
The Harris Court held that:
[T]he evidence in this case supports an inference that the defendant knocked or threw [the victim] to the floor, forcibly removed her sweat pants and parted her legs in an attempt to rape her. It further supports the inference that she resisted and the defendant stabbed her to death. This is sufficient evidence to survive a motion to dismiss.
[Harris, supra, 354 S.E.2d at 224.]
A similar inference (i.e., that Joann Roberts resisted defendant's efforts to rape her and that he stabbed her to death) can be drawn here. The Harris Court went on to dismiss defendant's arguments that the facts did not support his intent to sexually assault the victim. Id.
The North Carolina Supreme Court addressed the instant issue in another capital case, State v. McDougall, 308 N.C. 1, 301 S.E.2d 308 (1983), cert. denied, 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 *351 (1983), habeas corpus denied sub nom., McDougall v. Dixon, 921 F.2d 518 (4th Cir.1990), cert. denied sub nom., McDougall v. Dixon, 501 U.S. 1223, 111 S.Ct. 2840, 115 L.Ed.2d 1009 (1991). In that case:
[The victim] was found on her back with her legs spread wide, her feet nearly up to her buttocks, knees raised and apart, and her nightgown drawn up to her upper chest, exposing her left breast. Many of the wounds were inflicted upon [the victim] while she was in a prone position. An examination of [the victim's] nightgown indicated that it had been pulled up before some of the stab wounds were inflicted.... [The defendant] ... had blood smeared upon his shirt and pants consistent with the blood type of [the victim]. These facts support a reasonable inference that McDougall caught [the victim] in the yard, knocked or threw her to the ground on her back, pulled her nightgown up and over her chest, and parted her legs in an effort to rape her. She resisted and fought back, and McDougall stabbed her to death. The evidence is sufficient to survive a motion for nonsuit[10]on the theory of murder during an attempted rape. State v. Knight, 248 N.C. 384, 103 S.E.2d 452 (1958); State v. Norman, 14 N.C. App. 394, 188 S.E.2d 667 (Ct.App. 1972).
[McDougall, supra, 301 S.E.2d at 316 (emphasis added).]
McDougall is clearly apposite to this case. The facts are similar. The inferences are entirely plausible when applied here. It is true that the legs of the victim in McDougall were apparently spread to a greater extent than the legs of Joann in the present case. Furthermore, the McDougall court refers to the presence of "some liquid" upon the genitals of the victim, McDougall, supra, 301 S.E.2d at 312, but never elaborates. However, any concerns regarding distinctions between McDougall and the instant case are assuaged by McDougall's progeny, Carter and Harris.
In addition to North Carolina, the supreme courts of Washington, Ohio, and Nevada have all held that evidence similar to that submitted in the instant case is sufficient to support a conviction for attempted rape in the context of capital trials. In State v. Gentry, 125 Wash.2d 570, 888 P.2d 1105 (1995), cert. denied, ___ U.S. ___, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995), the young victim *352 was found with her sweatshirt and T-shirt pulled up to the middle of her breast area. "Her jeans and underpants had been pulled down around her thighs." Id. 888 P.2d at 1124-25. There was no definitive evidence of rape. Id. at 1114. The court held that "a rational trier of fact could well conclude that" the defendant had attempted to rape the victim. Id. at 1125 (emphasis added). The defendant's death sentence was upheld.
In State v. Scudder, 71 Ohio St.3d 263, 643 N.E.2d 524 (1994), reconsideration denied, 71 Ohio St.3d 1459, 644 N.E.2d 1031 (1995), cert. denied, ___ U.S. ___, 115 S.Ct. 2623, 132 L.Ed.2d 864 (1995), the victim was found with her pants at her ankles and her panties at mid-thigh.[11] Again, the court found "this evidence was clearly sufficient for a reasonable jury to conclude that [the defendant] attempted to rape [the victim]." Scudder, supra, 643 N.E.2d at 533 (emphasis added).
In Dawson v. State, 103 Nev. 76, 734 P.2d 221 (1987), denial of post-conviction relief aff'd, 108 Nev. 112, 825 P.2d 593 (1992), reh'g denied, (Nev. 1992), cert. denied, 507 U.S. 921, 113 S.Ct. 1286, 122 L.Ed.2d 678 (1993), reh'g denied, 507 U.S. 1046, 113 S.Ct. 1884, 123 L.Ed.2d 502 (1993), the State submitted the aggravating factor that the murder was committed while the defendant was engaged in an attempted sexual assault upon the victim. "Even though no physical evidence of rape was discovered, the victim's body was found nude from the shoulders down." Dawson, supra, 734 P.2d at 222. The court found that an attempted sexual assault was "supported by the evidence." Ibid.
There are also several non-capital cases which have found evidence similar to that submitted here sufficient to support a conviction for attempted rape. In Underwood v. State, 515 N.E.2d 503 (Ind. 1987), reh'g denied, (Ind. 1988), denial of habeas corpus *353 aff'd sub nom., Underwood v. Clark, 939 F.2d 473 (7th Cir.1991), the Supreme Court of Indiana upheld a conviction for attempted rape where the evidence was considerably less than that submitted here. In Underwood, the defendant attacked the victim and threw her to the ground, where he pinned her down. He cut her hand with a knife. The victim was able to punch the defendant in the groin and escape. Underwood, supra, 515 N.E.2d at 507. However, before escaping, the defendant grabbed the victim by her shorts. The defendant made no statement indicating an intent to rape the victim. The Indiana Supreme Court sustained the conviction. "[I]t was for the jury to weigh the pertinent facts ... and to determine whether or not there was competent evidence beyond a reasonable doubt that [defendant] intended his attack to culminate in the rape of the victim. There are sufficient facts in the record to support such a conclusion." Ibid.
In the case at hand, the evidence shows that defendant substantially succeeded in his effort to disrobe Joann. Therefore, there is considerably more evidence of intent to rape.
The Supreme Court of Illinois also addressed the instant issue. People v. Bonner, 37 Ill.2d 553, 229 N.E.2d 527 (1967), cert. denied 392 U.S. 910, 88 S.Ct. 2067, 20 L.Ed.2d 1368 (1968). In Bonner:
"The assault was violent; the victim was thrown to the ground; the defendant reached under her coat and skirt and pulled down her slip while covering her mouth with his hand; he tore her blouse and attempted to pull off her skirt, and the assault ceased only when the police and [a] witness approached in response to her screams."
[Id. 229 N.E.2d at 533 (emphasis added).]
The court continued: "[u]nder these circumstances, does the law require the offense to be limited to assault and battery because the intent was not voiced in language, or the victim had not been sufficiently overcome for the assailant's physical acts to more completely manifest his intentions?" Id. (quoting People v. Mayer, 392 Ill. 257, 64 N.E.2d 372, 373 (1945)) (emphasis added). The Illinois Supreme Court affirmed defendant's conviction for attempted rape.
*354 As in Bonner, Menter was allegedly interrupted during the attempted aggravated sexual assault of Joann. Because she was "not sufficiently overcome" by defendant before he was interrupted, his full intentions were not "manifested." Nevertheless, the evidence supports a finding of attempted aggravated sexual assault. Bonner, supra, 229 N.E.2d at 533.
The State points out another case from Illinois in its supplemental brief. People v. Williams, 128 Ill. App.3d 384, 83 Ill.Dec. 720, 470 N.E.2d 1140 (1984). In that case:
The victim had been brutally attacked and dragged to an isolated place in the basement. Defendant suggest[ed] that her clothing could have been accidentally or incidentally removed during the beating. However, it was her underpants and stockings which were removed. The evidence support[ed] a finding that defendant was guilty of attempt[ed] rape beyond a reasonable doubt.

[Williams, supra, 470 N.E.2d at 1149 (emphasis added).]
People v. Williams is clearly apposite here. The case disproves any assertion that Joann's clothing "could have been accidentally or incidentally removed during" her murder. Ibid.
Although not entirely similar, Green v. Commonwealth, 223 Va. 706, 292 S.E.2d 605 (1982), offers many parallels to the case at bar. The Supreme Court of Virginia was confronted with the question of whether "the evidence [was] insufficient as a matter of law to support [defendant's] conviction for attempted rape. [Defendant] argue[d that] there was no proof of a specific intent to rape." Id. 292 S.E.2d at 608.
The defendant in Green appeared at the door of an elderly woman and represented himself as her new paper boy. When the victim went inside to retrieve a pencil to write down defendant's name and telephone number, Green followed her in. He pushed her into the den. Ibid.
In the den, Green threw the woman on the floor, pulled up her dress, and pulled her pants halfway down. He demanded her pocketbook, and she said it was in the bedroom. He then pulled her off the floor and pushed her to the other room. In the bedroom, Green shoved the victim on the bed, covered her head with a bedspread, and removed the money from her pocketbook. He then unzipped her dress and removed her bra, tearing the hooks from the garment. He threw her on *355 the floor, pulled her pants down and got on top of her. At this point, the victim's husband walked into the house, and Green, hearing him, ran out the front door.

[Ibid. (emphasis added).]
With the exception of the robbery, the facts of Green are quite similar to those alleged here. Both victims were pushed to the floor. Both victims had their panties pulled down. Both victims had their bras removed to some extent. And, most importantly, both defendants were interrupted during their attacks.
The Supreme Court of Virginia held that the evidence in Green was adequate to support the defendant's conviction for attempted rape.
For what purpose would a man attack a defenseless woman ...? Inferences and deductions may be properly drawn when they follow naturally from facts proven. In this case, the conduct of the accused, under the conditions and circumstances described, points with reasonable, if not unerring certainty, to his specific intent to commit rape. It is inconsistent with his innocence, or with any interpretation save that of such an intent.
[Green, supra, 292 S.E.2d at 608-09 (quoting Ingram v. Commonwealth, 192 Va. 794, 66 S.E.2d 846 (1951).]
Prior to oral arguments on the instant motion, this court alerted both parties to the case of Williams v. State, 262 Ga. 732, 426 S.E.2d 348 (1993). In Williams, the defendant confessed to police that he was landscaping for the victim during the day. That evening, he returned to the victim's home to rob her. Williams, 426 S.E.2d at 348.
The victim allowed the defendant to enter her home in order to use the phone. Once inside, defendant took a knife from the kitchen and stabbed her. "He then removed victim's underpants and hosiery, and placed them next to her body." Id. at 348-49. He proceeded to rob her. "There was no physical evidence that the victim had been sexually molested." Id. at 349. The court found this evidence insufficient to support defendant's conviction for attempted rape.
The foremost distinction between Williams and the instant case is that Williams provided the State with a narrative of what happened at the crime scene. He did not deny that he robbed and murdered the victim. However, "[i]n his statement to police the *356 defendant admitt[ed] committing all crimes of which he was convicted except the attempted rape of the victim." Id. at 350. This denial in the face of myriad admissions obviously influenced the Georgia Supreme Court's decision.
In the instant case, defendant has issued no statement, as is his constitutional right. Therefore, in reviewing the evidence, this court is not privy to a statement reciting what did or did not happen at the crime scene. Accordingly, this court must rule on the evidence as presented by the State.
As such, the cases from North Carolina, Washington, Ohio, Nevada, Indiana, Illinois and Virginia (cited above), in which there were no confessions, are of far more persuasive value. Moreover, during oral argument, the prosecutor further distinguished Williams from the case at bar, saying:
I would suggest to the Court that the case before the Court is substantially different from Williams [v. State]. Williams v. State ... is a case where Williams had the time and opportunity to do whatever it is he wished to do with the victim. He didn't have Omar interrupting him. He was there, he killed her, he takes the clothes off, he robs her, and is ultimately thereafter caught in the garage attempting to steal her car. It is not a situation where he had to stop because he might get caught.
[Transcript of Hearing on Pretrial Motions, Assistant Prosecutor Patrick R. Raviola; T33:15-24. See also, Green v. Commonwealth, 223 Va. 706, 292 S.E.2d 605, 608 (1982) (defendant interrupted during attempted rape), supra, at 30-31.]
This court finds these distinctions to be valid. As such, the pronouncements of the Supreme Courts of North Carolina, Washington, Ohio, Nevada, Indiana, Illinois and Virginia hold sway here. All of these courts have held that evidence similar to that submitted in the instant case is sufficient to sustain a conviction for attempted rape, beyond a reasonable doubt. Again, the standard here is far less than beyond a reasonable doubt. The State need only present "some evidence that justifies the submission of the specified aggravating factors to the trier of fact at the sentencing phase of the case." McCrary, supra, 97 N.J. at 143, 478 A.2d 339 (emphasis added). The State has satisfied that requirement.
*357 For these reasons, and more importantly, because of the conclusions stated in Parts III and IV, defendant's motion to strike aggravating factor three is denied.

VI

Motion to Dismiss Counts Four through Eight
Similarly, defendant's motion to strike counts four through eight[12] of the indictment (which are based upon the alleged attempted aggravated sexual assault), is denied. The preceding analysis amply demonstrates the validity of the indictment.
A motion to quash an indictment is addressed to the discretion of the trial court, State v. Then, 114 N.J.L. 413 [177 A. 87] (Sup.Ct. 1935), but the court's power to quash is not to be exercised except on "the clearest and plainest ground," State v. Davidson, 116 N.J.L. 325, 328 [184 A. 330] (Sup.Ct. 1936), and an indictment should stand unless it is "palpably defective," State v. Russo, 6 N.J. Super. 250, 254 [71 A.2d 142] (App.Div. 1950), certif. denied, 4 N.J. 456 [73 A.2d 212] (1950).
[State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952) (emphasis added).]
The indictment in the case at bar is not "palpably defective." Ibid. "An indictment ... appears sufficient on its face stands if the State presents the grand jury with at least `some evidence' as to each element of a prima facie case." State v. Vasky, 218 N.J. Super. 487, 491, 528 A.2d 61 (App.Div. 1987).
Moreover, the instant indictment is not subject to the deficiencies alleged by defendant. First, defendant argues that the indictment should be quashed because the principal witness before the grand jury, Efrain Diaz,[13] essentially recounted hearsay. This argument is without merit. "A grand jury may return an indictment based largely or wholly on hearsay testimony." Vasky, 218 N.J. Super. 487, 491, 528 A.2d 61 (App.Div. 1987); State v. Thrunk, 157 N.J. Super. 265, 278, 384 A.2d 906 (App.Div. 1978); State v. Ferrante, 111 N.J. Super. 299, 304-306, 268 A.2d 301 (App.Div. *358 1970); State v. Dayton, 23 N.J.L. 49, 56 (Sup.Ct. 1850) (emphasis added).
This rule is consistent with the United States Supreme Court decisions that recognize that hearsay and other informal proofs are permissible in determining issues that implicate important rights. See Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397, 402-03, reh'g denied, 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956) (an indictment may be returned on the basis of hearsay); see also Gerstein v. Pugh, 420 U.S. 103, 120-21, 95 S.Ct. 854, 866-67, 43 L.Ed.2d 54, 69 (1975) (hearsay admissible at probable cause hearings); United States v. Matlock, 415 U.S. 164, 174, 94 S.Ct. 988, 994, 39 L.Ed.2d 242, 252 (1974) (search warrant may be obtained on basis of hearsay).
[McCrary, supra, 97 N.J. at 146, 478 A.2d 339 (emphasis added).]
Consequently, defendant's motion to dismiss counts four through eight because they are based upon hearsay is denied.
Additionally, Assistant Prosecutor Patrick Raviola did not, as defendant alleges, exceed his charging authority in presenting this case to the grand jury.
Remaining respectful of and sensitive to a prosecutor's charging discretion, we seek to fetter it only to the extent necessary to protect a defendant's rights. Historically, a prosecutor has been vested with broad discretionary powers to be exercised in the conscientious discharge of the manifold responsibilities of his office. See State v. Laws, 51 N.J. 494, 510 [242 A.2d 333], cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. LeVein, [LeVien] 44 N.J. 323, 326-27 [209 A.2d 97], (1965); cf. State v. Winne, 12 N.J. 152, 174 [96 A.2d 63] (1953) (prosecutor has obligation to exercise discretion in good faith). The effect of this broad grant of power has been to accord a presumption of validity to the conduct of the prosecutor. See In re Investigation Regarding Ringwood Fact Finding Comm., 65 N.J. 512, 516 [324 A.2d 1] (1974); State v. Laws, supra, 51 N.J. 494 [242 A.2d 333].
[McCrary, supra, 97 N.J. at 142, 478 A.2d 339 (emphasis added).]
The prosecutor in the case at bar merely presented evidence to the grand jury. There is no indication that he exceeded his authority or unduly persuaded the grand jury. "Unless a prosecutor's conduct before a grand jury infringes upon the jury's decision-making function, it may not be the basis of a dismissal of the indictment." Vasky, supra, 218 N.J. Super. at 491, 528 A.2d 61; State v. Schamberg, 146 N.J. Super. 559, 564, 370 A.2d 482 (App. Div. 1977), certif. denied, 75 N.J. 10, 379 A.2d 241 (1977).
Accordingly, defendant's motion to strike counts four through eight is denied.

*359 VII

Motion to Dismiss Count Nine (Aggravated Criminal Sexual Contact)
In light of the foregoing analysis, defendant's motion to strike count nine of the indictment is denied. Count nine is predicated upon two scenarios. First, defendant is alleged to have committed an act of sexual contact upon Joann during the commission of murder. N.J.S.A. 2C:14-3a; 2C:14-2a(3). And second, defendant is charged with committing an act of sexual contact while threatening Joann with a deadly weapon. N.J.S.A. 2C:14-3a; 2C:14-2a(4).
"Sexual contact" means an intentional touching by the... actor, either directly or through clothing, of the victim's ... intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor. "Intimate parts" means the following body parts: sexual organs, genital area, anal area, inner thigh, groin, buttock or breast of a person.
[N.J.S.A. 2C:14-1d to -1e.]
As previously stated, this court has viewed several crime scene photographs depicting the body of Joann Roberts. She was found with her pants and panties pulled down and her breasts partially revealed. This is clear evidence that defendant most likely touched the breasts and possibly the genital area of Joann.
More importantly, as the above definitions illustrate, sexual contact is established even if defendant only touched the intimate parts of the victim "through [her] clothing." N.J.S.A. 2C:14-1d. Given the state in which Joann's clothing was found, a jury could easily surmise that her intimate parts were touched while defendant was stripping off her clothing.
Furthermore, even if the jury were to find that defendant did not touch the victim's intimate parts to sexually gratify himself, they could find that he touched her intimate parts to degrade or humiliate her. N.J.S.A. 2C:14-1d. And, the State need not prove an intent to penetrate. "The difference between aggravated criminal sexual contact and attempted sexual assault is that the former is proved by showing an unauthorized `touching', *360 N.J.S.A. 2C:14-1d, whereas the latter requires proof of an attempt of `an act of sexual penetration.'" State v. Dixon, 125 N.J. 223, 255, 593 A.2d 266 (1991) (quoting N.J.S.A. 2C:14-2c).
Given this court's previous holdings regarding the sufficiency of the evidence to support attempted aggravated sexual assault, there is substantial evidence to support a charge of aggravated sexual contact. This court finds that the sexual contact count of the indictment is not "palpably defective." Russo, supra, 6 N.J. Super. at 254, 71 A.2d 142; Weleck, supra, 10 N.J. at 364, 91 A.2d 751. As such, defendant's motion to strike count nine is denied.

VIII

Motion to Strike Aggravating Factor Two (Torture/Aggravated Assault)
This court begins its analysis of the State's second aggravating factor by delineating what portion of N.J.S.A. 2C:11-3c(4)(c) the State intends to prove. In its notice of aggravating factors, the State essentially quotes N.J.S.A. 2C:11-3c(4)(c) (hereinafter c(4)(c)), alleging that "the offenses were outrageously or wantonly vile, horrible or inhuman in that they involved torture, depravity of mind or an aggravated battery[14] to the victims." State's Notice of Aggravating Factors, at 2.
First, the State recognizes that the first portion of c(4)(c), i.e. that "[t]he murder was outrageously or wantonly vile, horrible or inhuman," has been declared nugatory. "Quite clearly the introductory language of the provision ... is indefinite beyond anyone's ability to remedy, and presumably was so recognized by the Legislature." State v. Ramseur, 106 N.J. 123, 199, 524 A.2d 188 (1987).
The State also concedes that the murders alleged here do not demonstrate "depravity of mind." Transcript of Hearing on *361 Pretrial Motions, Assistant Prosecutor Patrick R. Raviola; T58:5-7. The "depravity of mind" element of c(4)(c) denotes "society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose)." Ramseur, supra, 106 N.J. at 209, 524 A.2d 188.
The State acknowledges that defendant had a clear purpose in mind when he allegedly murdered Joann, Isabella and Shakia. His purpose was revenge. He intended to punish Latisha for rejecting his proposal of marriage. See State v. Gerald, 113 N.J. 40, 65-66, 549 A.2d 792 (1988) (where greed, anger, revenge or other similar motive is present, the depravity aspect of c(4)(c) should not be submitted to the jury).
Accordingly, this court's review of c(4)(c) is limited to the torture/aggravated assault prong of the statute. Unlike the attempted aggravated sexual assault aggravating factor, our Supreme Court has engaged in extensive analysis of the State's second aggravating factor.
Nevertheless, it appears that this court is again faced with a question of first impression. In its supplemental brief, the State sets forth two theories to support the second aggravating factor. First, the State contends that "defendant intended to cause Latisha Roberts extreme emotional pain and suffering by his actions." State's Supplemental Brief, at 30. This court will address that theory first. Second, the State maintains that "the defendant intended the victims to suffer extreme physical and psychological pain, in addition to death." State's Supplemental Brief, at 14 (emphasis added). This court rejects that theory for the reasons set forth in Part VIII(C).

VIII(A)

Did the Defendant Intend to  And in Fact  Cause Latisha Roberts Extreme Psychological Suffering?
The initial question then, is whether a defendant who "intended to cause a third party who is not the victim to suffer" *362 falls under the rubric of c(4)(c). See State v. Ramseur, 106 N.J. 123, 208 n. 34, 524 A.2d 188 (1987). The genesis of this argument is footnote 34 of Ramseur, cited above. After a protracted analysis and dissection of section c(4)(c), the Ramseur Court announced its holding. "We therefore start by including within Section c(4)(c) the class of murders in which defendant intended to, and did in fact, cause extreme physical or mental suffering  in addition to death." Ramseur, supra, 106 N.J. at 208, 524 A.2d 188 (emphasis added). At this point, the Court included a footnote. Footnote 34 reads: "[t]his includes cases where defendant intended to cause a third party who is not the victim to suffer." The footnote cites Strickland v. State, 247 Ga. 219, 275 S.E.2d 29 (1981), cert. denied, 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981), reh'g denied, 454 U.S. 1093, 102 S.Ct. 660, 70 L.Ed.2d 632 (1981).
It is this court's opinion that the footnote is part and parcel of the Supreme Court's holding on c(4)(c). The emphatic language of the Court makes this clear. The Court does not suggest that a defendant who intends to cause a third party to suffer might be encompassed by c(4)(c). On the contrary, the Court includes such cases under c(4)(c), just as it had previously "includ[ed] within Section c(4)(c) the class of murders in which defendant intended to, and did in fact cause extreme physical or mental suffering  in addition to death." Ramseur, supra, 106 N.J. at 208, 524 A.2d 188.
Furthermore, neither the footnote nor the sentence which precedes it restrict the scope of psychological torture to victims who are killed. The Court "include[s] within Section c(4)(c) the class of murders in which the defendant intended to, and did in fact cause extreme physical or mental suffering  in addition to death." Ibid. Read in its broadest sense, this sentence clearly encompasses defendant's actions. He intended to cause Latisha Roberts extreme mental suffering  in addition to killing her family. He "intended to cause a third party who [was] not the victim to suffer." Id. at 208 n. 34, 524 A.2d 188. As such, this court holds *363 that the conduct of defendant, as alleged, is encompassed by c(4)(c). "[T]he extreme ... mental suffering must be precisely what defendant wanted to occur in addition to death." Id. at 208-09, 524 A.2d 188.
Here, defendant quite literally spelled out his intent. On one styrofoam plate, he is alleged to have written: "Tecia, never fuck with me in life." On the other: "You may have cracked my world, but I devastated yours, go to hell, I'll be waiting for you." See supra Part I. (Emphasis added). The evidence suggests that William Menter wanted to  and did in fact  devastate Latisha Roberts' world by killing her family. This was done in retaliation for her rejection of him. There is no doubt that she has and will continue to endure extreme mental suffering because of the alleged acts of defendant.
This court's holding is strongly supported by the citation included in footnote 34, supra. Strickland v. State involved hauntingly familiar facts. In that case, the defendant, Strickland, and June Carroll had been dating for several years. Strickland asked Carroll to marry him. She refused and terminated the relationship. Some time later he came to June Carroll's house and killed three members of her family. He also shot and wounded June Carroll and her mother. Strickland, supra, 275 S.E.2d at 38.
Analyzing statutory language synonymous with N.J.S.A. 2C:11-3c(4)(c)[15], the Supreme Court of Georgia held that a rational trier *364 of fact could find that the aggravating factor existed beyond a reasonable doubt. Strickland, supra, 275 S.E.2d at 41. The court found that "the killings were the culmination of a preconceived plan to inflict mental distress upon June Carroll because she declined to become involved in Strickland's emotional problems by becoming his wife." Id. at 40.
Despite the macabre parallels between Strickland and the instant case, there are obvious differences. First and foremost, June Carroll was at the crime scene and was shot. It appears, however, that her presence was not dispositive of the court's analysis. The court found that "[d]epravity[16] may be proven in *365 many ways, including, as in the present case, by the killing of a victim in a vile, horrible or inhuman manner so as to inflict mental distress upon her close relative." Strickland, supra, 275 S.E.2d at 41[17] (citing Blake v. State, 239 Ga. 292, 236 S.E.2d 637 (1977), cert. denied, 434 U.S. 960, 98 S.Ct. 492, 54 L.Ed.2d 320 (1977), habeas corpus granted in part on other grounds sub nom. Blake v. Zant, 513 F. Supp. 772 (S.D.Ga. 1981)) (emphasis added).
In Blake, the defendant and his girlfriend had a heated argument at a bar. The defendant hit her on the side of the head and was ejected from the bar. Blake then went to his girlfriend's house and took her two-year old daughter, who was being watched by the child's grandmother. He apparently entered the girl's bedroom and kidnapped her without the grandmother's knowledge. Blake, supra, 236 S.E.2d at 639-40. The defendant went to a nearby bridge and threw the little girl off it, a drop of more than 100 feet. "Stripped of self-serving overtones this killing was nothing less than an act of vengeance against the victim's mother." Id. at 644.
Blake makes it clear that the person whom the defendant intends to suffer need not witness the killing. Rather, the focus is on the defendant's state of mind. This is wholly consistent with *366 Ramseur. "We are convinced that the essence of the legislative concern is the defendant's state of mind.... Our system of criminal laws is predicated usually on the imposition of punishment based on the defendant's intent." Ramseur, supra, 106 N.J. at 207-08, 524 A.2d 188.
Moreover, Blake and Strickland are entirely compatible with our Supreme Court's broad interpretation of c(4)(c).
[W]e cannot believe that the Legislature of New Jersey intended a construction of the provision that would limit it to only murders preceded by the infliction of physical pain. The language of this provision undeniably calls for a broader interpretation, and that interpretation can easily be accommodated to constitutional requirements. It is not tenable, for instance, to attribute to the Legislature a willingness to shield from the death penalty murderers who inflict psychological torture on their victims before death while condemning those whose brutality is limited to the infliction of physical pain.
[Ramseur, supra, 106 N.J. at 204-05, 524 A.2d 188 (emphasis added).]
The above quoted language precedes footnote 34. Therefore, it is in this "broad" context that the footnote must be viewed.
Furthermore, the sentences which follow footnote 34 indicate that the determination of whether a defendant's actions constitute torture or aggravated battery is primarily a fact-sensitive analysis. "`Torture' and `aggravated battery' take on adequate definiteness when the circumstances are described in terms of defendant's intention, and the requirement that defendant intentionally inflicted extreme physical or emotional pain eliminates the need for a distinction between the two statutory terms." Id. at 209, 524 A.2d 188.
Again, William Menter's intent is clearly reflected in the messages he allegedly wrote on the plates. See supra, Part I. These plates most certainly constitute "some evidence that justifies the submission of" aggravating factor two to a jury. McCrary, supra, 97 N.J. at 143, 478 A.2d 339. "It is not tenable ... to attribute to the Legislature a willingness to shield from the death penalty murderers who inflict psychological torture" on absent third parties "while condemning those whose brutality is limited to the infliction of physical pain [or psychological torture upon their *367 victims before death]." Ramseur, supra, 106 N.J. at 205, 524 A.2d 188.
Defendant should not be rewarded because Latisha was not at home to die with her family. Happenstance should not differentiate one murder or murders from another. "[T]he essence of the legislative concern is the defendant's state of mind." Id. at 207, 524 A.2d 188. Unfortunately, the Supreme Court of New Jersey has not expounded upon footnote 34 since Ramseur. Nevertheless, the footnote and its implications remain.
Accordingly, this court adopts the plain meaning of footnote 34 and holds that "a reasonable fact-finder could ... conclude that ... the aggravating factor exists." McCrary, supra, 97 N.J. at 144, 478 A.2d 339. There is more than "some evidence" that the "[d]efendant intended to cause a third party who [was] not [a] victim to suffer." Ramseur, supra, 106 N.J. at 208 n. 34, 524 A.2d 188; McCrary, supra, 97 N.J. at 143, 478 A.2d 339. There is clear evidence that defendant intended to  and did in fact  inflict extreme "mental suffering" upon Latisha. Ramseur, supra, 106 N.J. at 208, 524 A.2d 188.
Defendant's motion to strike aggravating factor two is denied as applied to the State's first theory.

VIII(B)

Bill of Particulars
As with the third aggravating factor, this court orders the State to supply defendant with a bill of particulars detailing the aforementioned theory. R. 3:7-5. The State shall designate which of defendant's actions warrant inclusion under c(4)(c). The State will further specify what it intends to prove beyond a reasonable doubt at trial. This will enable defendant adequately to prepare his case. See supra, Part IV(D). This court will hold the State to its stated theory at trial.

*368 VIII(C)

Did Defendant Intend to  And in Fact  Inflict Extreme Physical and Psychological Pain Upon Joann, Isabella and Shakia  in addition to death?
The State advances another theory in support of the second aggravating factor. It is alleged that defendant tortured his victims, intending that they suffer extreme physical and mental pain  in addition to death. State's Supplemental Brief, at 14. Unlike the previous theory, our Supreme Court has provided ample guidance on this aspect of N.J.S.A. 2C:11-3c(4)(c).
In Ramseur, the Court announced a two-part test to determine if torture or aggravated assault exist. The Court "includ[ed] within Section c(4)(c) the class of murders in which defendant [1] intended to, and [2] did in fact, cause extreme physical or mental suffering  in addition to death." Ramseur, supra, 106 N.J. at 208, 524 A.2d 188 (emphasis added).
First, the State has presented strong evidence that the victims did in fact endure extreme physical suffering. The autopsy reports, detailing multiple neck wounds to each victim, are abundant evidence. Similarly, in his statement, Omar described how his grandmother Isabella was gasping for air after defendant cut her throat. Statement of Omar Roberts, at 12. He further recounted how defendant followed Shakia into the bedroom and slashed her throat again. Id. at 15. It is also tenable (as the State contends) that each victim underwent severe psychological suffering knowing that they and their relatives would soon die. See State v. McDougald, 120 N.J. 523, 566, 577 A.2d 419 (1990), limited on other grounds by State v. Brown, 138 N.J. 481, 651 A.2d 19 (1994).
However, evidence that the victims did in fact endure physical or mental suffering, by itself, cannot support an aggravating factor count under c(4)(c). "Our concern is that if the c(4)(c) factor could be sustained on ... evidence [of revenge] alone, there would be `no principled way to distinguish [a] case, in which the death *369 penalty was imposed, from the many cases in which it was not.'" State v. Hunt, 115 N.J. 330, 389, 558 A.2d 1259 (1989), reconsideration denied, 117 N.J. 152, 564 A.2d 873 (1989) (quoting Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398, 409 (1980)). That is why our Supreme Court has always been "convinced that the essence of the legislative concern is the defendant's state of mind." Ramseur, supra, 106 N.J. at 207, 524 A.2d 188. As such, evidence of either mental or physical suffering, without concomitant evidence of defendant's intent to inflict such suffering, will not sustain c(4)(c).
Here, the State has presented scant evidence that William Menter intended to cause the victims "extreme physical or mental suffering  in addition to death." Ramseur, supra, 106 N.J. at 208, 524 A.2d 188 (emphasis added).
On this record, [this court] find[s] the evidence . .. insufficient for a rational jury to find torture in the statutory sense. See McDougald, supra, 120 N.J. at 566, 577 A.2d 419. Multiple stab wounds, when combined with evidence of intent to torture, might support a charge on c(4)(c). Hunt, supra, 115 N.J. at 389, 558 A.2d 1259. At most, the evidence here demonstrates ... violent killing[s] from a knife attack that lasted several minutes.

[State v. Erazo, supra, 126 N.J. 112, 138, 594 A.2d 232 (1991) (emphasis added).]
Erazo is plainly apposite to the case at hand. The defendant in Erazo was convicted of killing his wife. The victim sustained multiple knife wounds. Id. at 120, 594 A.2d 232.
First, the Supreme Court made it clear that aggravated assault should be subsumed under the heading of torture. As such, aggravating factor c(4)(c) now consists of two alternatives: "torture" or "depravity of mind." Id. at 137, 594 A.2d 232.
The Court subsequently engaged in an extended review of its holdings on the torture aspect of c(4)(c).
One element of torture is intent. Ramseur, supra, 106 N.J. at 208, 524 A.2d 188. The Court has found the requisite intent in a number of cases. See State v. Moore, 122 N.J. 420, 474-78 [585 A.2d 864] (1991) (S. Moore); (defendant repeatedly struck wife in head with hammer, and medical testimony suggested defendant intended her to suffer); State v. McDougald, 120 N.J. 523, 566-67, 577 A.2d 419 (1990) (defendant repeatedly slashed and bludgeoned his victims before killing them); State v. Davis, 116 N.J. 341, 376, 561 A.2d 1082 (1988) [(1989)] (defendant stabbed and mutilated victim's body with screwdriver and knife, in addition to *370 killing her by strangulation with an electric cord); State v. Zola, 112 N.J. 384, 434, 548 A.2d 1022 (1988) (defendant tied victim up, beat her severely, and scalded her body such that sixty-percent of her body was missing skin), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989); Ramseur, supra, 106 N.J. at 286-88, 524 A.2d 188 (defendant repeatedly stabbed victim, left, returned to inflict more wounds, and said that he would kill her grandchildren if he could find them). By contrast, on several occasions the Court has found the evidence insufficient to justify a charge that the defendant intended the victim to endure pain and suffering during the commission of the murder. See Matulewicz, supra, 115 N.J. at 200, 557 A.2d 1001 (defendant struck baby on head, threw her into crib, then shook her to death); State v. Rose, 112 N.J. 454, 527-33 [548 A.2d 1058] (1988) (Rose I) (defendant shot victim once in abdomen with shotgun); State v. Biegenwald, 106 N.J. 13, 50 [524 A.2d 130] (1987) (Biegenwald II) (defendant shot victim four times in head at close range).
[Erazo, supra, 126 N.J. at 137-38, 594 A.2d 232 (emphasis added).]
The foregoing recitation illustrates that the State has presented insufficient evidence to support its charge that William Menter intended Joann, Isabella and Shakia to suffer "extreme physical or mental suffering  in addition to death." Ramseur, supra, 106 N.J. at 208, 524 A.2d 188. To fully understand this, it is necessary to step away from the obvious emotional impact which accompanies the triple murder of three family members, and view each murder individually. It must be remembered that the multiple murder aspect of this crime is addressed by aggravating factor one. "Each of the murders was committed while the defendant was engaged in the commission of the other murders." See supra, Part II. N.J.S.A. 2C:11-3c(4)(g).
Accordingly, this court is focused solely upon the question of whether defendant intended to torture each victim  in addition to killing them. Other than a few defensive wounds, none of the victims was injured beyond the immediate neck area. It is apparent that defendant's intent was to kill  not to torture. Additionally, by slashing the major arteries of the neck, defendant most likely intended a quick death for each victim. Even so, the State has presented testimony from Omar indicating that Isabella was "gasping for air." Statement of Omar Roberts, at 12. Omar also testified that his sister Shakia walked into the bedroom bleeding from her neck, before defendant followed her in and attacked her again. Id. at 15. Although this evidence is sufficient *371 to indicate that the victims most likely endured "extreme physical or mental suffering," it does not satisfy the second part of the test. There is no evidence that defendant intended such suffering  in addition to death. Ramseur, supra, 106 N.J. at 208, 524 A.2d 188. At the conclusion of the rampage, Omar reports that defendant said: "[t]his shouldn't have happened." That is not the statement of someone bent on torture. See supra, Part I.
The State relies heavily on State v. McDougald, 120 N.J. 523, 577 A.2d 419 (1990), in its effort to meet the second part of Ramseur's test. McDougald had been dating the teenage daughter of the victims, Walter and Maria Bass. After they instructed their daughter not to see the defendant, he and a teenage companion killed them. In addition to slitting Mr. Bass' throat, the defendant bludgeoned him with a baseball bat. In addition to cutting Mrs. Bass' throat, the defendant and his accomplice beat her with the bat, dropped a cinder block on her head and shoved the broken bat three inches into her vagina. McDougald, supra, 120 N.J. at 532-33, 577 A.2d 419. After reversing McDougald's death sentence on other grounds, the Court held the evidence was sufficient to resubmit the c(4)(c) factor to a new penalty phase jury. Id. at 566, 577 A.2d 419.
McDougald is plainly distinguishable from the instant case. McDougald alternated between three deadly weapons in his efforts to kill Mr. and Mrs. Bass. First he used a knife, then a bat, then a cinder block. This is indicative of someone intent on inflicting "extreme physical ... suffering  in addition to death." Ramseur, supra, 106 N.J. at 208, 524 A.2d 188. Moreover, both victims suffered severe trauma to their heads, in addition to knife wounds.
In contrast, William Menter used one weapon, a box cutter. He methodically cut each of his victims throats. Although he returned to Isabella and Shakia after his initial attacks upon them, this denotes the frenzied nature of the murders. It does not demonstrate an intention to inflict pain in addition to death. The evidence suggests that, after his initial assault upon Joann, defendant *372 attacked each victim as they came at him. He did not seek the victims out, as McDougald did. McDougald, supra, 120 N.J. at 532-33, 577 A.2d 419. If Menter had been searching for victims, he would have found two-year old Zaire, asleep in another bedroom. See supra, Part I.
Furthermore, there is no evidence of a bifurcated intent on defendant's part to psychologically torture Latisha by physically torturing her family. Rather, the evidence discloses an exclusive intent to punish Latisha in retaliation for her rejection of defendant. See supra, Part VIII(A). Quite simply and sinisterly, defendant slashed until he was satisfied each victim was dead. Ironically, this may have saved Omar's life. Defendant obviously believed Omar was dead when he left the bedroom. If Menter was intent on torturing his alleged victims  in addition to killing them  Omar would not be alive. Again:
[a]t most, the evidence here demonstrates ... violent killing[s] from a knife attack that lasted several minutes ... To constitute torture, the defendant must have intended to inflict pain incremental to that attributable to the act of killing. Here, the record is devoid of any such evidence. It bespeaks ... killing[s] that [were] violent and brutal, not one[s] that [were] the product of torture. If so lethal an attack in so brief a period demonstrates "torture," then virtually any murder could be considered a capital offense.
[Erazo, supra, 126 N.J. at 138-39, 594 A.2d 232 (emphasis added).]
This court finds the above pronouncements of the New Jersey Supreme Court dispositive of the instant issue. Accordingly, defendant's motion to strike aggravating factor two is granted as applied to the State's second theory. The State is prohibited from asserting at trial that William Menter intended to cause Joann, Isabella and Shakia extreme physical or mental suffering  in addition to death.

IX

Conclusion
In summary, defendant's motion to strike aggravating factor three (attempted aggravated sexual assault) is denied. Similarly, defendant's motion to dismiss counts four through nine of the *373 indictment is denied. The State is ordered to provide defendant with a bill of particulars clearly delineating its theory with respect to the charge of attempted aggravated sexual assault. R. 3:7-5.
Defendant's motion to strike aggravating factor two (N.J.S.A. 2C:11-3c(4)(c)) is denied in part and granted in part. The State is limited at trial to the theory that William Menter intended to  and did in fact  cause Latisha Roberts extreme mental suffering when he killed her family. The State is ordered to supply defendant with a bill of particulars clearly detailing that theory. R. 3:7-5.
The State is barred from alleging at trial that defendant intended to cause Joann, Isabella and Shakia Roberts extreme physical or mental suffering  in addition to death.
NOTES
[1] Count four charged that "William Menter did cause the death of Joann Roberts, during the commission of the crime of attempted aggravated sexual assault, contrary to the provisions of N.J.S.A. 2C:11-3a(3)" (felony murder).

Counts five and six reiterate the above language, charging defendant with the felony murders of Isabella and Shakia Roberts. The underlying felony is the attempted aggravated sexual assault of Joann Roberts.
Counts seven and eight charged defendant with the attempted aggravated sexual assault of Joann Roberts under two scenarios. First, it is alleged the act was attempted during the commission of a homicide (count seven). N.J.S.A. 2C:14-2a(3). Second, it is charged that the act was attempted while defendant "was armed with a weapon or an object fashioned in such a manner as to lead Joann Roberts to reasonably believe it to be a weapon and [that defendant] threatened by word or gesture to use the weapon or object" (count eight) contrary to N.J.S.A. 2C:14-2a(4).
Finally, count nine charged that defendant committed an act of aggravated criminal sexual contact upon Joann Roberts under two scenarios. First, it was alleged that the aggravated criminal sexual contact took place while defendant was in the commission of a homicide. N.J.S.A. 2C:14-3a; 2C:14-2a(3). Second, the State avers that the aggravated criminal sexual contact took place while defendant was armed with a weapon in such a way that Joann Roberts was threatened with its use. N.J.S.A. 2C:14-3a; 2C:14-2a(4). Aggravated criminal sexual contact is a crime of the third degree.
[2] Because there are five members of the Roberts family included in this recitation of evidence, they will be referred to by their first names for the sake of clarity.
[3] "Michelle" is Michelle Wilson, a friend of Latisha. Ms. Wilson related that on July 16, 1994, at approximately 11:15 pm, defendant telephoned her apartment and asked to speak with Latisha. Ms. Wilson stated that Latisha was not there and hung up on defendant. Next, she dialed "Star 69" (which initiated automatic redial). At first there was no answer. The second time she called, defendant answered the phone.

Ms. Wilson then telephoned the Roberts' Wegman Parkway residence. The phone was answered by defendant. Ms. Wilson asked to speak with Joann Roberts. Defendant asked to speak with Latisha. Ms. Wilson recounted that defendant then told her that Joann Roberts could not come to the phone and hung up.
Ms. Wilson phoned the Roberts' residence again and became alarmed when the answering machine picked up. She and her boyfriend, Robert Lee, went to the Roberts' residence. When they arrived, they summoned the Jersey City Police Department to the scene.
[4] Tecia is the name defendant used for Latisha Roberts.
[5] An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:

....
(3) The act is committed during the commission, or attempted commission ... [of] homicide....
(4) The actor is armed with a weapon or any object fashioned in such a manner as to lead the victim to reasonably believe it to be a weapon and threatens by word or gesture to use the weapon or object.
[N.J.S.A. 2C:14-2a(3) and -2a(4).]
A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
....
(3) Purposely does ... anything which, under the circumstances as a reasonable person would believe them to be, is an act ... constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
[N.J.S.A. 2C:5-1a(3).]
[6] Swan has been cited with approval in State v. Mathis, 47 N.J. 455, 463, 221 A.2d 529 (1966), rev'd on other grounds, 403 U.S. 946, 91 S.Ct. 2277, 29 L.Ed.2d 855 (1971), reh'g denied, 404 U.S. 876, 92 S.Ct. 31, 30 L.Ed.2d 125 (1971); State v. Wynn, 21 N.J. 264, 269, 121 A.2d 534 (1956); State v. Still, 112 N.J. Super. 368, 372, 271 A.2d 444 (App.Div. 1970), certif. denied, 57 N.J. 600, 274 A.2d 53 (1971); and State v. Tropiano, 154 N.J. Super. 452, 455, 381 A.2d 828 (Law Div. 1977).
[7] It should be noted that when the two crimes existed, it was accepted that attempted rape required a lesser degree of "proximity of success" than assault with intent to commit rape. State v. Still, 112 N.J. Super. 368, 371, 271 A.2d 444 (App.Div. 1970). Therefore, although the case at bar involves an assault, the lesser "proximity of success" requirements of attempted rape apply. Ibid.
[8] Nevertheless, it is not necessary for the State to prove that the victim was alive at the precise moment the defendant allegedly pulled down her panties and shorts. "The suggestion that when the victim dies from shock directly resulting from the attack upon her, and the death precedes attempted penetration, the party committing the assault does not come within the condemnation of the statute, is entirely too unsubstantial to justify extended discussion." State v. Knight, 96 N.J.L. 461, 470, 115 A. 569 (1921).
[9] N.C. Gen. Stat. § 15A-2000(e)(5) provides that the following is an aggravating circumstance:

(5) The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or unlawful throwing, placing, or discharging of a destructive device or bomb.
With the exception of the aiding and abetting provision (which is not relevant here), and a few additional crimes, the North Carolina statute essentially conveys the same meaning as New Jersey's felony murder aggravating factor.
N.J.S.A. 2C:11-3c(4)(g) declares that the following is an aggravating factor: (g) The offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit murder, robbery, sexual assault, arson, burglary or kidnapping.
The similarity between the two statutes demonstrates the efficacy of comparing New Jersey and North Carolina case law.
[10] A nonsuit is a "type of judgment rendered against [a] party in a legal proceeding [based] upon his inability to maintain his cause in court." Blacks Law Dictionary 1058 (6th ed. 1990).
[11] Unlike the instant case, blood marks indicated that the defendant had apparently raked his fingers over the victim's pubic region. These finger marks also demonstrated that the defendant likely spread the victim's legs. Scudder, supra, 643 N.E.2d at 533.
[12] See supra, n. 1.
[13] Diaz is an investigator with the Hudson County Prosecutor's Office.
[14] In 1985 the Legislature amended Section c(4)(c) to substitute "aggravated assault" for "aggravated battery." L. 1985, c. 178.
[15] The statutory aggravating circumstance in Ga. Code Ann. § 17-10-30(b)(7) (formerly § 27-2534.1(b)(7)) is as follows: "[t]he offense of murder ... was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

The United States Supreme Court examined and refused to strike down Ga. Code Ann. § 27-2534.1(b)(7) (recodified as § 17-10-30(b)(7)) in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), reh'g denied, 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982). The Court found that:
[T]he Georgia Supreme Court had by 1977 reached three separate but consistent conclusions respecting the § (b)(7) aggravating circumstance. The first was that the evidence that the offense was "outrageously or wantonly vile, horrible or inhuman" had to demonstrate "torture, depravity of mind, or an aggravated battery to the victim." The second was that the phrase "depravity of mind," comprehended only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim. The third ... was that the word, "torture," must be construed in pari materia with "aggravated battery" so as to require evidence of serious physical abuse of the victim before death.
[Godfrey, supra, 446 U.S. at 431, 100 S.Ct. at 1766.]
[16] The Georgia Supreme Court's interpretation of § (b)(7) differs somewhat from the New Jersey Supreme Court's analysis of c(4)(c). Georgia holds that "depravity of mind" merely constitutes the mental state which precipitates torture and aggravated battery. That is why the Strickland court states that "depravity may be proven in many ways." Strickland, supra, 275 S.E.2d at 41. It appears that a reference to "depravity" in Georgia necessarily encompasses torture and aggravated battery, the end results of a depraved state of mind.

As previously discussed, New Jersey views "depravity of mind" apart from torture and aggravated assault. These differences in interpretation are not relevant to this court's review of Strickland. That is because Ramseur directly references Strickland in the context of its analysis of the torture/aggravated assault prong of c(4)(c). The New Jersey Supreme Court does not invoke Strickland in its explication of depravity of mind.
It should be noted that New Jersey and Georgia are in agreement that "`torture' must be construed in pari materia with `aggravated battery.'" Godfrey, supra, 446 U.S. at 431, 100 S.Ct. at 1766.
It should further be noted that Strickland was decided after Godfrey, cited above. Unlike the jury in Godfrey, the Strickland jury based its verdict upon the depravity/torture/aggravated assault aspect of § (b)(7), in addition to the deficient "outrageously or wantonly vile, horrible or inhuman" portion of the statute. See Strickland, supra, 275 S.E.2d at 40. More importantly, Ramseur was decided long after Godfrey. As such, the Ramseur court obviously agreed that Strickland was not subject to the same deficiencies as Godfrey.
[17] The only other references to Strickland by the New Jersey Supreme Court are in two dissenting opinions by Justice Handler. In Ramseur, Justice Handler argues that:

The Georgia Court has ... strayed from its original conclusion that "depravity of mind" comprehended only that mental state that led the murderer to torture or batter his victim before death ... [I]n interpreting "depravity of mind," the Georgia court has found that ... intent to inflict psychological distress on a witness [may be considered]. Strickland v. State, supra, 275 S.E.2d 29 (1981).
[Ramseur, 106 N.J. at 373, 524 A.2d 188 (Handler, J., dissenting).]
Justice Handler repeats the above assertions in State v. Davis, 116 N.J. 341, 393, 561 A.2d 1082 (1989) (Handler, J., dissenting). This court is satisfied that Justice Handler's individual analysis does not detract from the majority's reliance upon Strickland in footnote 34 in Ramseur.